## CASCADEN v. DUNBAR et al.

### (Circuit Court of Appeals, Ninth Circuit. October 3, 1911.)

### No. 1,938.

1. ESTOPPEL (§ 70*)—EQUITABLE ESTOPPEL—ACQUIESCENCE.

Pending a suit to recover a half interest in a mining claim, the legal title to which was in defendants and alleged by plaintiff to be fraudulently withheld from him, defendants made two leases, together covering the claim, reserving royalties. Plaintiff expressly assented to one of the leases and made no objection to the other, of which he had knowledge. He subsequently obtained an injunction restraining defendants from working the claim, but shortly after consented to the appointment of a custodian to receive and hold the royalties under the leases, which prior to that time had been appropriated by defendants. *Held*, that he had in effect ratified the leases, and, although he recovered in the suit, was estopped to claim one-half the gross product of the claim and was entitled to recover only one-half the royalties.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 183–187; Dec. Dig. § 70.*]

2. TENANCY IN COMMON (§ 28*)—MUTUAL RIGHTS AND LIABILITIES—RENTS—EXTENT OF LIABILITY ON ACCOUNTING.

On recovery by plaintiff of part interest in a mining claim owned as tenants in common by him and defendants, who had leased the claim and divided the royalties between them, plaintiff was entitled only to several judgments against defendants for the amount of royalties received by each in excess of his rightful share.

[Ed. Note.—For other cases, see Tenancy in Common, Cent. Dig. §§ 76–88; Dec. Dig. § 28.*]

3. DEPOSITS IN COURT (§ 9*)—SUIT TO RECOVER PART INTEREST IN MINE—IMPOUNDING OF ROYALTIES FROM LESSEES—RIGHTS IN FUND.

Plaintiff brought suit to recover a half interest in a mining claim, pending which defendants leased the claim and received and appropriated the royalties until, on application of plaintiff, the court impounded

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

future royalties by ordering them paid by the lessees to a custodian agreed on by the parties, to be held until further order of the court. Plaintiff prevailed in the suit, and an accounting for rents and profits was directed. *Held*, that the fund so impounded was in custodia legis, held in trust to answer the demands of the litigants when their rights should be determined, and that an assignment of his interest therein by a defendant to a third person was subject to the right of plaintiff to have the share of such defendant applied in payment of the judgment recovered against him for past royalties.

[Ed. Note.—For other cases, see Deposits in Court, Dec. Dig. § 9.*]

4. DEPOSITS IN COURT (§ 9*)—SUIT TO RECOVER INTEREST IN MINE—IMPOUNDING OF ROYALTIES UNDER LEASES—RIGHTS IN FUND.

For like reasons, the conveyance by any one of the defendants of his interest in the mining claim after the order impounding the royalties to third persons chargeable with knowledge of the fact carried no interest in the fund accruing thereafter, except subject to plaintiff's right to have the same applied in payment of any judgment recovered by him for the sums found due him from defendants as his share of such prior rents.

[Ed. Note.—For other cases, see Deposits in Court, Dec. Dig. § 9.*]

Appeal from the District Court of the United States for the Fourth Division of the Territory of Alaska.

Suit in equity by D. H. Cascaden against George F. Dunbar, Charles Scott, J. Bennett, F. C. Manley, and A. C. Rice, and the First National Bank of Fairbanks, Alaska, and S. A. Bonnifield, receiver. From final decree, complainant appeals. Modified.

This is a second appeal. 157 Fed. 62, 84 C. C. A. 566. The suit was instituted June 11, 1904, by Cascaden to recover possession of an undivided one-half interest in a certain mining claim, known as "No. 12a below discovery, first tier, right limit of Cleary creek, among others, situated in Fairbanks recording district, district of Alaska. The findings of the trial court were rendered June 15, 1905, and a decree entered August 5, 1905, awarding to the plaintiff an undivided one-third of the claim. On the appeal to this court, the plaintiff was adjudged to be the owner of an undivided one-half. The decree here was rendered October 28, 1907, and it was thereby ordered and directed that the cause be "remanded to the court below with directions to award the plaintiff an undivided one-half of the interest of the defendants in the claims relocated by the defendant Dunbar in May, 1903, and his appropriate interest in the proceeds thereof." The claims referred to in the decree include claim No. 12a below discovery. The mandate having gone down to the court below, the cause came on for hearing upon an accounting between the parties touching the gold mined from claim No. 12a, and the present appeal is from the decree of the court rendered upon such accounting.

The claims were originally located by Cascaden for Bennett, Dunbar, and Scott, copartners, under an agreement whereby Cascaden was to have an undivided one-half interest for his services in making discovery and locating the claims. Later the members of the copartnership relocated the claims, in fraud of the rights of plaintiff. It was for this fraud that this court declared the relocations to be for the benefit of plaintiff to the extent of a one-half interest.

The trial court made findings of fact as follows, briefly stated:

(1) That on May 7, 1904, Bennett, Scott, and Dunbar held the legal title to the claims.

(2) On that date Bennett conveyed all his interest therein to Scott and Dunbar.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

(3) On the same day Scott and Dunbar conveyed to defendants Manley and Rice an undivided one-third interest in whatever interest the grantors possessed in such mines.

(4) On August 30, 1905, Scott conveyed his interest in the claim to Dunbar.

(5) On September 15, 1905, the court, on the application of plaintiff, made an order enjoining and restraining defendants from working the claim, provisional upon the plaintiff filing a bond in the sum of $5,000, and the failure of the parties to agree upon "a suitable and proper person * * * to receive the rents, royalties, gold and gold dust and proceeds on said mining claim pending the further litigation thereof, and to be held subject to the order of this court."

(6) That plaintiff executed the undertaking.

(7) On the same day, plaintiff and defendants agreed upon J. Donnelly, he being one of the lessees under defendants, as a suitable custodian of the gold mined from the claim.

(8) During October, 1905, Donnelly was allowed to resign, and Clement Alexander, also one of the lessees under defendants, was selected in his stead. Alexander served as custodian until December 15, 1906, when, upon application of the parties, he was discharged by order of the court. Thereupon Samuel A. Bonnifield was in like manner selected and designated as such custodian.

(9) Alexander turned over to Bonnifield $33,533.79, being the amount and value of the royalties on the gold dust mined while the former was custodian.

(10) Bonnifield served until May 22, 1908, when he, in pursuance of the order of the court, turned over to the clerk of the court $51,675.36, the amount then in his possession by virtue of his receivership.

(11) In September, 1904, the defendants Dunbar, Scott, Manley, and Rice let to Humes Bros. the lower half of Bench claim No. 12a for 30 per cent. royalty on the amount of gold mined.

(12) Humes Bros. mined the claim until July 19, 1905, when they sold to Donnelly, Alexander, and Morrison. The latter continued operations up to and subsequent to the date of the order of injunction and the selection by the parties of a custodian of the royalties.

(13) The market value of the gross amount of gold extracted by Humes Bros. and Donnelly, Alexander, and Morrison, from the claim under the lease, up to the time Donnelly was selected as custodian, was $69,596.20, of which said amount Dunbar and Scott each received as rents $6,959.62, and Manley and Rice each $3,479.81. The balance of the royalties accruing under the lease, upon gold extracted by Donnelly, Alexander, and Morrison subsequent to the selection of a custodian, was delivered over to such custodian.

(14) On October 20, 1904, Dunbar, Scott, Manley, and Rice let the upper half of Bench claim No. 12a to Riley, O'Malley, and Donnelly, reserving 40 per cent. on the gold extracted as rental.

(15) At the time of giving said lease, or later, the plaintiff entered into an agreement with Riley, O'Malley, and Donnelly. By this agreement it is stipulated as follows.

"Now, therefore, for and in consideration of the sum of one dollar, lawful money of the United States of America, to him in hand paid by the parties of the second part, the receipt whereof is hereby acknowledged, and in consideration of said parties of the second part undertaking so to extract the gold, minerals, and precious metals from said premises, so that the person or persons entitled thereto, as may be determined in said action at law, may have the benefit thereof, the party of the first part covenants and agrees to and with the parties of the second part not in said action at law or in any other action at law or in equity, to apply for an order enjoining said parties of the second part from working said premises as in said contract of lease or purported contract of lease provided.

"But nothing in this agreement contained shall be construed as recognizing the right, or any right, in said Rice, Manley, Dunbar, and Scott to execute said contract of lease, or to said premises or to any part thereof; but said action, or any other action to be commenced and involving the title to said premises shall be tried as if said lease or purported lease and these presents had not been made and executed, save and except as hereinbefore provided.

"And if in said action or in any other action involving the title to said premises, the party of the first part shall, on final judgment or decree, be adjudged or decreed the owner of said premises or of any part thereof or of any interest therein, then and in that event, the party of the first part covenants and agrees to and with the parties of the second part to make and execute a lease to and of said premises or of such part or interest thereon or therein as to said party of the first part shall be so awarded, to the parties of the second part for a term ending on said 20th day of October, 1907, at noon, such lease to contain the same covenants and conditions and agreements as said contract of lease or purported contract of lease herein referred to."

(16) By virtue of their lease, Riley, O'Malley, and Donnelly mined the property until long after a custodian was selected by the parties.

(17) That the market value of the gross amount of gold mined by Riley, O'Malley, and Donnelly under their lease, to the time of the selection of a custodian, was $92,466.61, of which said sum Dunbar and Scott each received $12,328.80, and Manley and Rice each $6,164.40. The remaining royalties, accruing after the selection of a custodian, were paid over to such custodian.

(18) Since the date of the order of injunction and the selection of a custodian, namely, September 15, 1905, the lessees of said claim have deposited all the rents and royalties with the custodian or with the clerk of the court.

(19) Royalties in gold dust turned over to the custodians, of the value of $51,665.36, with the consent of plaintiff and defendants, have been sold and reduced to money, which is now in the hands of the clerk, and the clerk has also in his possession 15 pokes, said to contain 1,250.75 ounces of gold dust, being for royalties from the mine accruing since about June 1, 1908.

(20) During the years 1904 and 1905, and prior and subsequent to the injunction and selection of a custodian, the plaintiff resided in a cabin adjacent to Bench claim No. 12a, and had full knowledge and notice of the mining operations being carried on by Humes Bros., Donnelly, Alexander, and Morrison, and Riley, O'Malley, and Donnelly, and at no time protested against the same.

(21) That Cascaden, after the granting of the injunction, consented that Donnelly, Alexander, and Morrison, and Riley, O'Malley, and Donnelly should continue the mining operations, and did not, prior to September 15, 1905, take any steps to enjoin the mining operations upon said property.

(22) On the 20th of August, 1906, Dunbar executed a mortgage upon his interest in the mine to E. T. Barnette to secure a note given by himself and J. C. Kellum, and at the same time assigned to Barnette all his right and interest in and to three pokes of gold dust, then on deposit with the First National Bank of Fairbanks, containing in the aggregate 1,214.51 ounces; said gold dust being then and there held by the bank pending the final determination of this action on appeal.

(23) On the 19th of September, 1906, Barnette assigned the mortgage and his interest in the three pokes of gold dust to Bonnifield.

(24) On September 18, 1906, Bonnifield loaned to Dunbar $10,320, and, for the purpose of securing the payment of the same, Dunbar gave Bonnifield a mortgage on his interest in the mining claim, and thereafter, for the purpose of paying his obligation, assigned and transferred to Bonnifield all his interest in and to the gold dust, subsequently to come into possession of Bonnifield as custodian, as royalty from the operation of the mine.

(25) On July 1, 1907, Rice assigned to Bonnifield all his interest in the royalties in the latter's possession, and also conveyed to Bonnifield all his interest in the mine.

(26) On September 12, 1907, Manley directed Bonnifield to apply his interest in the gold dust then in the latter's possession to the payment of a claim which Manley owed to Bonnifield.

(27) On April 4, 1909, Bonnifield assigned all his interest in and to the royalties to the First National Bank of Fairbanks.

(28) That Manley and Rice, in letting the leases and in receiving one-third of the royalties as aforesaid, acted honestly and in good faith.

As conclusions of law, the court found, briefly stated:

(1) That by reason of the decision of the Court of Appeals the deed from

Dunbar and Scott to Manley and Rice operated to convey a one-sixth interest only in the mine.

(2) That Manley and Rice were entitled to but one-sixth of the royalties accruing prior to September 15, 1905, and are entitled to one-sixth only of the royalties now in the hands of the clerk of the court.

(3) That Dunbar, at the time he executed the mortgage to Barnette, was the owner of an undivided one-third of the mine, and that the First National Bank of Fairbanks is entitled to one-third of the royalties on deposit with the clerk.

(4) That plaintiff is entitled to a decree adjudging him to be the owner of an undivided half interest in all the mining properties located by Dunbar in May, 1903.

(5) That plaintiff is entitled to judgment for one-half the royalties mined and extracted from the properties since September, 1904, up to the time of the selection of a receiver or custodian, which said royalties amount to the sum of $57,865.50; the one-half being $28,932.75.

(6) That plaintiff is entitled to an order decreeing him to be the owner of one-half the royalties in the custody of the clerk of the court.

(7) That plaintiff is entitled to judgment against Manley in the sum of $4,822.13, against Rice for a like sum, and against Dunbar and Scott for the sum of $19,288.50.

(8) That plaintiff is entitled to an order directing the clerk to pay over to him sufficient of the deposits to satisfy these judgments.

(9) That the mortgage executed by Dunbar to Bonnifield and the assignment of the gold dust to him to secure the payment of said sum of $10,320 are void, and that the deed and assignment from Rice to Bonnifield are also void.

(10) That plaintiff is entitled to interest on the said sum of $28,932.75 from August 15, 1905, at 8 per cent.; the same to be paid by defendants in proportion to the respective judgments against them.

(11) That plaintiff is entitled to recover his costs and disbursements.

H. J. Miller, T. C. West, and F. De Journel, for appellant.

John L. McGinn, Metson, Drew & Mackenzie, and E. H. Ryan, for appellees.

Before GILBERT and MORROW, Circuit Judges, and WOL-VERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). Numerous objections and exceptions were taken to the findings of the court, as to both the fact and the law; but the objections here are reduced practically to three. These are:

First, as it respects the measure of distribution of the proceeds of the claim.

Second, the manner of giving judgment against Dunbar, Manley, and Rice; the same being severally instead of jointly and severally.

Third, awarding the First National Bank of Fairbanks one-third of the funds in court under a mortgage and assignment admittedly paid and discharged.

Before entering upon a discussion of these objections, the legal title should be settled. This was practically done when the case was here before. The plaintiff was declared to be the owner of an undivided one-half interest in the mining claims involved. This left in Scott and Dunbar an undivided one-half; but, they having conveyed to Manley and Rice an undivided one-third of their interest, which would be an undivided one-sixth of the whole, an undivided one-third

was left in their right. The judgment as to the title of these mining claims should therefore be for the parties in proportion as thus indicated.

It subsequently appears that Scott has sold his interest to Dunbar, and that Dunbar and Rice have made some conveyances to Bonnifield; but as the pleadings are not in this record, and it does not appear that any supplemental pleading has been filed showing the title of Bonnifield and praying judgment therefor, none can be rendered in his favor. Bonnifield is not made a party in any way to the suit. The only capacity in which he has ever acted or appeared is as custodian of royalties, and to protest against the order of the court directing and requiring him to pay the deposits into the court.

[1] The contention, as it pertains to the first objection, is that plaintiff is entitled to judgment for the gross product of the mine, instead of for the royalties received upon the leases only. This depends upon the acts and conduct of plaintiff with respect to the leasing to Humes Bros. and other lessees by Dunbar, Scott, Manley, and Rice. It appears from the findings of fact that Humes Bros. acquired their lease on the lower half of the mine during the month of September, 1904, and Riley, O'Malley, and Donnelly acquired theirs on the upper half on October 20, 1904. As to this latter lease, the plaintiff expressly agreed with the lessees, by a written contract of even date with the lease, not to disturb them by injunction or otherwise, in the cause then pending for a determination as to the ownership of the mining claims during the continuance of their lease, and, if successful, plaintiff further agreed to continue the lease until the end of the three years term, namely to October 20, 1907. This contract recites, among other things, that:

"In consideration of said parties of the second part (the lessees) undertaking so to extract the gold, minerals, and precious metals from said premises, so that the person or persons entitled thereto, as may be determined in said action at law, may have the benefit thereof, the party of the first part covenants," etc., thus indicating that the plaintiff was agreeable to the lessees' entering into the contract of leasing with Dunbar and others.

Under this lease, Riley, O'Malley, and Donnelly extracted, prior to the time a custodian was selected, $92.466.61, and the entire royalties to that time were appropriated by Dunbar and other lessors. Plaintiff's counsel claims that the amount of gold extracted in that time was in excess of $100,000; but we think the finding of the court in that respect is about as nearly correct as can be determined. The finding furthermore that there was extracted under the Humes lease gold to the value of $69,596.20 we deem to be in accordance with the weight of the testimony.

Later, on September 15, 1905, the plaintiff applied for an injunction to restrain Dunbar, Scott, Manley, and Rice from further extracting the gold from the mine, which was duly issued. On the same date, however, at the suggestion of the court, plaintiff and defendants agreed to the appointment of a custodian, with authority to receive the royalties and hold them for the parties in the suit entitled thereto. An agreement to the receipt of the royalties or rentals by the cus-

todian for the parties interested was tantamount to an agreement that the lessees should have all the gold extracted except the royalties for their services in extracting the same. This was in effect a ratification of the leases, at least from that time forward. Otherwise plaintiff should have insisted that the gross amount be paid into the hands of the receivers, instead of the royalties only. Beyond this evidence of plaintiff's assent to the leasing, plaintiff testifies that Humes Bros. told him of their lease at the time they procured it from Dunbar and others, and the percentage of the output they were to receive, and that he took no steps to stop them. It further appeared that plaintiff, during the time, was living in a cabin by the side of the claim, and was about the mining operations from time to time, and saw the cleanups "quite frequently," and never made protest in any way. In talking of another lease given while the receivers were in charge, to which he was asked to assent, though refusing his assent, he said in effect that he had made no trouble with respect to the other leases, and would make none as to this. It is further to be remarked that J. Donnelly, the first custodian of the royalties, agreed upon by plaintiff, was one of the lessees from Dunbar, Scott, Manley, and Rice, and Alexander, the second custodian, was one of the successors to Humes Bros. under their lease, and was selected while such lessee. Beyond this, plaintiff, with the defendants, agreed with the successive receivers that they should act without compensation. From all which it would seem that, if the plaintiff did not consent in the first instance to the making of these leases, he subsequently ratified them, and was willing to accept the royalties only, as his proper share of the gold extracted from the mine. He ought not, therefore, to be now heard to claim one-half of the gross amount of gold extracted from the mines, however fraudulently Dunbar, Scott, Manley, and Rice may have acted in appropriating the royalties. It is very true that, where the trespass is willful and unlawful, and property is appropriated, the appropriator should be held for its gross value. Sweeney v. Hanley, 126 Fed. 97, 61 C. C. A. 153. But in this case there is such an implied assent to and ratification of the leasing by plaintiff as to preclude him from claiming the gross.

[2] Advancing to the next contention of counsel for appellant, which is that the judgment should have been given jointly and severally against Dunbar, Manley, and Rice, it is clear from the foregoing considerations that these parties are subject to an accounting for only the rents and royalties received by them beyond their proportionate share. "It is well settled by all the authorities," say the authors of the American and English Encyclopedia of Law ([2d Ed.] vol. 17, p. 693), "that where one tenant leases the common property to a third person and receives the rents, he is liable to account to his cotenants for their proportionate share." See, also, Tarleton v. Goldthwaite's Heirs and Adm'r, 23 Ala. 346, 58 Am. Dec. 296; McCaw v. Barker et al., 115 Ala. 543, 22 South. 131; Gedney v. Gedney, 160 N. Y. 471, 55 N. E. 1; Howard v. Throckmorton, 59 Cal. 79.

It must follow that one tenant could not be held to account to another for more than the share received by him above that which he is

proportionately entitled to. It being ascertained, therefore, the proportionate amount of the rents and royalties received by Dunbar, Scott, Manley, and Rice, the court below was right in entering a several judgment for the amount each received above his own appropriate share; but it should not have given a joint and several judgment against Dunbar and Scott.

[3] It is next contended that the court erred in awarding to the First National Bank of Fairbanks one-third of the funds in court; they being the accumulation of royalties on leases of the mine after the selection of custodians by the parties litigant. The First National Bank claims through Dunbar's mortgage of the mine, and his assignment of his interest in the gold dust in custody of the receiver to Barnette, Barnette's assignment to Bonnifield, and the latter's assignment to the bank. It will be necessary to go into these transactions a little more minutely than has been done as shown by the findings of the court for a clear exposition of the situation.

On August 30, 1905, Scott deeded his entire interest in the mine to Dunbar. On August 20, 1906, Dunbar executed to E. T. Barnette a mortgage on the mine, with other property, to secure the payment of a joint note of $30,000 made and delivered to Barnette by Dunbar and J. C. Kellum. On the same date Dunbar assigned to E. T. Barnette, trustee, all his interest in three pokes of gold dust, further described as "now on deposit" with the First National Bank, of Fairbanks, Alaska," whereby Dunbar stipulated as follows:

"Said gold dust is held by the said First National Bank pending a lawsuit now on appeal to the Circuit Court of Appeals wherein David and John Cascaden are plaintiffs and Manley, Rice, and Dunbar are defendants. And I hereby authorize the said E. T. Barnette, or agent, when said suit is settled or when said gold dust is released, to take said gold dust from said First National Bank, and apply the same on a mortgage given by me on this date to the said E. T. Barnette for the sum of thirty thousand dollars."

On August 27, 1907, Barnette made this assignment of the gold dust to Samuel A. Bonnifield, namely:

"I hereby assign and set over all my right, title, and interest in and to the gold and gold dust described on the reverse side of this sheet of paper unto Samuel A. Bonnifield, his executors, administrators, and assigns."

On September 19, 1906, Barnette, for value, assigned to Samuel A. Bonnifield the mortgage of August 20th given on the mine. On September 9, 1907, Dunbar assigned to Bonnifield all his right, title, and interest in the gold dust then in the hands of Bonnifield as trustee in pursuance of the stipulation entered into between the parties in the case of Cascaden v. Dunbar and others, pending in the Circuit Court of Appeals. The former assignment of gold dust to Barnette was referred to in this latter assignment, and Bonnifield was authorized and empowered "to take of the gold and gold dust that has been deposited since the time of said assignment to the said E. T. Barnette with him as trustee, or which has come into his hands as trustee," such amount as was sufficient to pay two certain notes one of date September 18, 1906, for $4,320, and the other of date May 17, 1907, for $6,000, and to apply the balance of the trust fund upon the $30,000

mortgage given to Barnette. By the same instrument, Dunbar assigned and transferred "all gold and gold dust" that might be thereafter taken from No. 12a until the money he owed to Bonnifield should have been paid in full. "This assignment," concludes the document, "is to transfer at once all of my title in and to the gold dust now on deposit with the said S. A. Bonnifield and held by him as trustee, and, also, all dust that has been extracted from said claim No. 12a below Discovery on Cleary Creek, and which has come into his hands as trustee, and also all future gold that may be mined and extracted from said property which shall similarly be deposited with him."

On April 11, 1909, Bonnifield sold, assigned, and set over unto the First National Bank all of his right, title, and interest in and to that certain fund described as "now on deposit with the clerk of the District Court for the Third Division of the Territory of Alaska, in that certain action entitled Cascaden v. Dunbar et al., being numbered 165," and empowered the bank to institute such proceedings in his name as might be necessary to enforce the payment. This constitutes the bank's chain of title from Dunbar, based upon the mortgage and assignment of the fund to secure the payment of the $30,000 obligation, in so far as it is traceable from the record. It absolutely confers no title to the mine, and in reality none to the mortgage on the mine. There seems to be a complete chain of assignment as it pertains to the fund, and it is by this right, we presume, that the bank claims title thereto. Furthermore, it is shown by the testimony of C. J. Hurley, president of the bank at the time he testified, that the $30,000 mortgage has been paid in full and wholly discharged, and that Kellum paid it. This in itself should preclude the bank from further claim upon the mine or the fund by virtue of the mortgage or the pledge, for, if the obligation which they were given to secure is paid, the mortgage and pledge should be discharged. But, to proceed: There has been some intimation that Kellum was a surety on the note only, and that he was entitled to be subrogated to the mortgagees and his assignees' position with reference to the security; but there is no pertinent testimony to support the claim, and Kellum has not been made a party to the suit.

The first assignment of the gold dust on deposit, which was by way of pledge, was made by Dunbar to Barnette August 20, 1906. This assignment recognizes the fact that the gold dust was held by the bank pending the lawsuit here now being prosecuted by this second appeal. This was then a recognition by Barnette, the pledgee, that the fund was held in trust for a specific purpose. Further, Barnette was only authorized to apply the gold dust to the payment of the mortgage when the suit was settled. Thus he knew he was not entitled to the gold dust until the interests of the parties to the litigation were subserved, and it was practically so stipulated. At that date, it is true, Bonnifield was not the custodian of the fund, but he was such custodian when Barnette assigned the pledge to him on August 27, 1907, and must be held to have fully known the conditions under which he held such fund. The fund was, from the time of the selection of the first custodian, September 15, 1905, and at that time—the time

of the assignment of the pledge to Bonnifield—in custodia legis to subserve the several interests of the parties litigant according to their superiority of right.

Some suggestion has been made that Donnelly, Alexander, and Bonnifield were merely the custodians by selection of the parties, and were not appointees of the court in such a sense as made them the officers of the court, and that the fund was never, until paid into the hands of the clerk, in the custody of the court or the law. This view cannot be sustained. The very inception of the agreement of the parties to the selection of a custodian was by application to the court to impound the royalties, and the agreement to the selection of the custodian was made at the suggestion of the court. The order entered on the application was that the royalties received by the custodian "be held subject to the order of this court." Furthermore, the custodians or receivers were all deemed to be subject to the orders and directions of the court at all times. Alexander, it appears from the findings, upon application of the parties, was discharged by order of the court, and Bonnifield was agreed to and named in his stead, and ultimately Bonnifield turned the funds over to the clerk by order of the court. In short, the fund was always, from the time of its impounding, treated as within the custody of the court, and was in reality, and in legal effect, in custodia legis.

At the time when the gold dust began to be impounded, Dunbar, Scott, Manley, and Rice had appropriated of Cascaden's proportion of the royalties $28,932.75. It was because of these misappropriations and failure to account, no doubt, that Cascaden finally concluded to seek the appointment of a receiver, and the purpose was that he might be reimbursed the amount theretofore appropriated by these parties, as well as to secure a just distribution of the royalties thereafter to be paid into the hands of the custodian. It was only fair and equitable, in view of the conduct of Dunbar, Scott, Manley, and Rice, that such a disposition should be made of these royalties and of those subsequently to accrue in the hands of the custodians.

Whoever, therefore, dealt with this fund in court, dealt with it subject to the just rights and equities of Cascaden to be reimbursed and secured his rightful proportion of the accumulated royalties arising from the leases made by Dunbar, Scott, Manley, and Rice. While Dunbar assigned his interest in the three pokes of gold dust in the bank to Barnette prevous to Bonnifield's becoming custodian of the fund, Bonnifield had no right, after his selection, to deal with the fund in any other manner than as trustee, and of course he was charged with notice of the condition of the fund and the rights of the respective parties litigant thereto and the bank, dealing with him, could acquire no better or superior right than he had. We conclude, therefore that the conclusion of law of the District Court that the First National Bank was entitled to one-third of the money and gold dust on deposit with the clerk was error. It should have been that the bank was entitled to such one-third interest subject to the right of Cascaden to be reimbursed out of it for that proportion of Cascaden's royalties that Dunbar and Scott appropriated.

[4] Four other matters are yet to be considered, namely: The mortgage given by Dunbar to Bonnifield on the mining claim No. 12a, executed April 6, 1907, to secure payment of two notes one for $6,-000 and the other for $4,320, each given by Dunbar to Bonnifield on the 18th day of September, 1906; the deed from A. C. Rice to Bonnifield of date July 1, 1907, to the former's interest in the mine; the assignment by Rice to Bonnifield of the same date of all Rice's interest in the royalties then in custody of the receiver and deposited in the First National Bank; and the direction of Manley to Bonnifield to apply the former's interest in the gold dust then in the latter's custody to the payment of a claim which Manley owed to Bonnifield.

As it relates to the mortgage, it is claimed that but $2,000 has been paid on the notes, and that the balance remains unpaid. We do not find that the bank has ever come into the title to this mortgage. But, however that may be, Bonnifield was trustee at the time he took and accepted this mortgage, and was custodian of the royalties then in his hands for the purposes of the trust, and the fund could not in any way be affected by it to the detriment of Cascaden.

As to the Rice deed, Bonnifield does not appear by the record to have parted with what title he thus acquired to Rice's interest in the mine, and the transfer would seem to have no particular relation to this controversy.

Bonnifield's interest in the fund acquired by the assignment from Rice, whatever it was, passed, we presume, to the bank under Bonnifield's assignment of the fund to the bank of date April 11, 1909, above noticed. So of Manley's interest in the fund acquired by direction to apply to the payment of his debt to Bonnifield. But as Bonnifield, being trustee of the fund, could not thus have acquired any interest from Rice detrimental to the rights of Cascaden, the bank could not acquire any greater right from Bonnifield. Furthermore, the bank is chargeable with adequate knowledge of the conditions existing relative to the fund, Bonnifield being its president, and undeniably it cannot claim as an innocent purchaser. So it is not in a position to deny the rights of Cascaden in the fund, being the accumulated royalties arising from the leasing of the mine. The District Court was therefore in error in adjudging that the bank was entitled to one-third of the money and gold dust on deposit with the clerk of the court. We further conclude as follows:

1. That the royalties received from the leasing of the mine prior to the selection of a custodian were $57,865.50.

2. That Cascaden is entitled to one-half of these royalties, amounting to $28,932.75.

3. That Dunbar should account to Cascaden for one-third of this sum, or $9,644.25, for which Cascaden is entitled to judgment against him.

4. That Scott should account to Cascaden for a like amount, and the latter is entitled to judgment therefor.

5. That Manley should account for one-sixth, or $4,822.125, to Cascaden, for which the latter should have judgment.

6. That Rice should account for a like amount, for which also Cascaden should have judgment.

7. That Cascaden is entitled to one-half of the royalties, including the moneys as well as the gold dust now in the hands of the clerk and in the registry of the court, as his rightful proportion thereof.

8. That Cascaden should receive from the other half of the fund in court the sum of $28,932.75.

9. That the First National Bank of Fairbanks is entitled to the balance, or whatsoever remains of such fund after the payment of plaintiff.

10. Plaintiff is entitled to his costs and disbursements against defendants, including the bank.

The decree of the court below will be modified to conform to this opinion.