**PARAFFINE OIL CO. et al. v. CRUCE et al.**

No. 7706—Opinion Filed Dec. 26, 1916.

Concurring Opinion Jan. 2, 1917.

Rehearing Denied Jan. 30, 1917.

(162 Pac. 716.)

(Syllabus by the Court.)

### 1. Oil and Gas—Lease—Construction.

On November 6, 1913, lessors leased a tract of land for oil and gas mining purposes to the P. company, which thereafter assigned certain interests therein to other oil companies. Section 3 fixed the term of the lease for one year, "and so long thereafter as oil or gas * * * is produced from said land" by the lessee, "its successors or assigns, in accordance with the stipulations of sections 6 and 7 of this contract." After section 5 obligated the lessee to begin operations for drilling in 30 days and to diligently prosecute the same until a test well was completed, section 6 provided: "That if said territory proves productive, then the lessee to complete this contract shall drill as many as eight wells on said premises." The test well proved the territory productive January 20, 1914, and it took about 20 days to drill a well. Held, that "if" means "when," and that "then" is an adverb of time and means "at the time," and that, at the time the territory proved productive by the drilling of the test well, it was then the duty of the lessee to drill as many as eight wells upon the premises and within a year from the date of the lease as a condition precedent to the extension of the lease beyond the term of one year fixed in the lease. And, whether said wells were by the lessee drilled with due diligence and dispatch, having in view the interests of both parties to the lease, and so as to produce all the oil and gas that might be reasonably produced from the premises, as required by the lease, if available as a defense, was a question of fact; and, being found adversely to defendant, will not be disturbed, there being evidence reasonably tending to support the finding. And there being no question that oil was found in paying quantities in the first well drilled, and there being evidence reasonably tending to support the finding of the court, in effect, that there was at its completion a profitable market for the product of the first well, the lessee cannot escape a forfeiture of the lease, declared by the trial court, in virtue of section 11 of the lease, for failure to drill as many as eight wells upon the premises within one year from the date of the lease, under the plea that there was not a profitable market at its completion for the product of the first well.

### 2. Same.

Where the language of the lease was as much that of the lessee as that of the lessors, the lease will be construed most strongly against the lessee, so as to promote develop-ment and prevent delay and unproductiveness, looking to all parts of the instrument in the light of the facts contained in the record.

### 3. Landlord and Tenant — Leases — Conditions.

No particular words are necessary to create a condition. The intention of the parties must be determined from the language used by them in the lease, and from the subject-matter to which such language relates. Such intention being determined, it governs.

### 4. Oil and Gas Lease—Rights of Parties—Diligence in Operations.

Where the object of the operations contemplated by an oil and gas lease is to obtain a benefit or profit for both lessor and lessee, neither is, in the absence of a stipulation to that effect, the arbiter of the extent to which or the diligence with which the operations shall proceed; but both are bound by the standard of what, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both.

### 5. Same—Conditions Precedent.

Precedent conditions must be literally performed, and even a court of chancery will never vest an estate, when, by reason of a condition precedent, it will not vest in law. It cannot relieve from the consequences of a condition precedent unperformed.

Error from District Court, Carter County; W. F. Freeman, Judge.

Action by W. I. Cruce and others against the Paraffine Oil Company, a corporation, and others. There was a judgment for plaintiffs, and defendants bring error. Affirmed, with directions.

Geo. S. Ramsey, James B. Diggs, Rush Greenslade, Malcolm E. Rosser, Henry McGraw, R. A. Hefner, L. S. Dolman, and Edgar A. DeMeules, for plaintiffs in error.

C. B. Stuart, M. K. Cruce, and Thos. Norman, for defendants in error.

TURNER, J. On February 18, 1915, W. I. Cruce and three other lessors, defendants in error, in the district court of Carter county sued the Paraffine Oil Company, lessee, and four other oil companies, plaintiffs in error, claiming an interest therein under the Paraffine Company as assignees, to cancel an oil and gas lease. The petition as amended substantially states: That on November 6, 1913, plaintiffs made, executed, and delivered to the Paraffine Oil Company a certain oil and gas mining lease on a certain 40-acre tract of land, described in the petition, in which said company thereafter assigned an interest to its four codefendant companies. That the material parts of the lease read:

"Sec. 3. It is agreed that this lease shall remain in force for a term of one year from this date, and as long thereafter as oil or gas, or either of them, is produced from the said land by the party of ‘the second part, its successors or assigns, in accordance with the stipulations of sections 6 and 7 of this contract. * * *

"Sec. 5. Party of the second part agrees to begin operations for the drilling for an oil or gas well within thirty days from the delivery of this contract, and to diligently prosecute said operations until said well is completed.

"Sec. 6. It is understood and agreed by both parties hereto that if said territory proves to be productive, then the party of the second part to complete this contract shall drill as many as eight wells on said premises and said wells shall be drilled with due diligence and dispatch, having in view the interest of both parties hereto, and so to produce all the oil and gas that may be reasonably produced from said premises: Provided that if oil be found in paying quantities in the first well drilled, and there is at the completion of said well, no profitable market for the products of same, the second party shall not be required to begin the drilling of the second well until a market for the products of the first well is available. * * *

"Sec. 7. The party of the second part shall drill as many offset wells as may be necessary to offset each paying well on the adjacent property when such well on adjacent property is within three hundred feet of the boundaries of the premises herein leased."

"Sec. 11. A failure on the part of the second party to comply with any of the stipulations of this contract shall of itself work a forfeiture of this contract and all rights thereunder."

The petition further states that about 30 days thereafter the Paraffine Company, as lessee, drilled a well on the land which was productive to the extent of 150 barrels of oil a day, at which time there was a profitable market of $1.05 per barrel for all the oil that could then be produced upon the demised premises; that on February 25, 1914, said company drilled another well on the premises, which was productive to the extent of 480 barrels of oil per day; that thereafter, for some time, said lessee developed the lease no further and not until plaintiff complained of its failure so to do pursuant to the terms of the lease, whereupon, pursuant to its promise so to do, said lessee drilled a third well upon the premises which had an initial average production of 300 barrels of oil per day; and that since that time the lessee has neither drilled nor attempted to drill other wells upon the premises and has made no preparation in the way of building

tanks or otherwise to take care of the oil from the aforesaid three producing wells. The petition further states that oil-bearing sand is about 1,000 feet beneath the surface of the land, that a well could be drilled thereto in 30 days, and that by the exercise of ordinary diligence the lessee could, within the term of one year fixed by the lease, have drilled eight wells as required by the terms thereof, but had failed so to do.

The petition further states that, although the three producing wells had an initial capacity of 800 barrels a day, defendants have so negligently operated the same that their total production is less than 200 barrels per day, that less than 10 per cent. of their capacity has been taken therefrom, and that the. royalties of the plaintiff lessors have been correspondingly reduced. They further allege "that if the defendants had completed the eight wells upon said land, which said contract required, the total capacity for production would have been much greater than the capacity of the three wells now on said premises," and that on or about November 19, 1914, "plaintiffs notified the defendants and each of them that because of their failure to comply with the terms of said contract, that each forfeited all rights under the same. Said notice was in writing and was delivered to and received by the president and secretary of each of the defendant companies, and said original notice is now in the possession of each one of the defendant companies," by reason of all of which they pray that the lease be declared forfeit and canceled, and for general relief.

For answer, each of the defendants, after denying "all and singular the allegations contained in plaintiffs' petition, except as hereinafter specifically admitted," admitted the execution of the lease and the assignments thereof to the codefendants of the Paraffine Company as alleged, and pleaded that they had complied with the terms and conditions of the lease, and that upon its execution and delivery they "took possession of the premises covered by said lease, and have drilled three wells for oil and gas purposes, and have erected a derrick on said premises for a fourth well, and that these defendants have expended on said premises, in the way of drilling wells and in betterments and improvements," large sums of money; "that among other things paragraph 6 of said contract provides that the lessee shall not be required to begin the drilling of the second well until a market for the products of the first well is available, and these defendants would show that there is not now and has never been a market for the products of said well or any other well on said premises"; and "that they went into possession of said premises according to the

terms of said lease and have developed said property in accordance with the terms of the same in the utmost good faith and with due diligence under all the circumstances and conditions surrounding the lease and on good, sound business judgment."

The reply was, in effect, a general denial. Thus it will be seen that plaintiffs tendered an issue that the lease was forfeit on the ground that the lease required the lessee to drill eight wells upon the demised premises within the fixed term of one year, and that such had not been done. And that defendants joined issue on the allegation that the lease required them so to do, and pleaded in confession and avoidance that, if the lease so required, they were excused from so doing on the ground, not that oil was not found in paying quantities in the first well drilled, but that there was no market for the product of the first or test well. And, further, that they had developed the property "in the utmost good faith and with due diligence under all the circumstances and conditions surrounding the lease on good sound business judgment," which, they say, was all the lease required them to do, which plaintiffs denied.

There was trial to the court upon the issues joined, who found for the plaintiffs, in effect, that oil had not only been "produced" by the test well, but that it had been found in paying quantities, and that hence the lease not only required that eight wells be drilled upon the demised premises within the term of one year, but that such had not been done, and, further, that there was a market for the produce of the first well at the time it was completed, and hence defendants were not excused from drilling eight wells within the year, and that defendants had not developed the property in the utmost good faith and with due diligence, as pleaded, and rendered and entered judgment forfeiting the lease. To reverse which it is contended that, as the lease was written by the lessors, the language of the lease must be construed most strongly against them, and, so construed, the lease does not require that eight wells be drilled upon the demised premises within the term of one year from the date thereof. But this lease was not written by the lessors. Upon this point the evidence discloses that the day before the lease was made, executed, and delivered the same was prepared and was the result of the collaboration of three of the lessors representing themselves, and the president of the Paraffine Company, his attorney and another, representing the lessees, and that when A. C. Cruce, the fourth lessor, the next day participated in the work of preparing the lease, he redictated the lease as thus prepared, and changed it in so far only as to grant a term of one year instead of five, and added to paragraph 3 the

words "in accordance with sections 6 and 7 of this contract," and perhaps by making certain other minor changes in the lease, not necessary to mention. The lease was then executed, without objection, by all parties in interest.

From all of which we cannot say that the language of the lease was that of the lessors, and hence should be construed most strongly against them. Rather are we of opinion that the language was as much that of the lessee as that of the lessors, and for that reason we are constrained to adhere to the rule announced in Superior Oil Co. v. Mehlin, 25 Okla. 809, 108 Pac. 545, 138 Am. St. Rep. 942, where we said:

"The favorable presumptions which are usually indulged in behalf of ordinary lessees are not enjoyed by those holding leases of the character whose enforced execution is sought by plaintiff in this action, for the doctrine seems to be fundamental that * * * oil and gas leases are construed most strongly against the lessee and in favor of the lessor."

But, however this may be, as we are of opinion that there is little or no ambiguity in the language of the lease upon the point in question, we will construe the lease in the light of the facts disclosed by the record and determine whether it was or was not the intention of the parties thereto to require the lessee to drill eight wells upon the premises demised within one year from the date thereof.

Concerning the rules governing the construction of leases such as this, in a valuable note to Hiller v. Ray, 59 Fla. 285, 52 South. 623, reported in 20 Ann. Cas. 1165, it is said:

"Mining leases executed for the purpose of exploring and operating for oil and gas frequently contain a provision designed to compel the prompt commencement of operations and the diligent prosecution of the development of the lands, and such covenants have been before the courts for construction in a number of recent cases. Owing to the differences of the covenants in the various leases, the courts have usually rested their decision upon the facts of the particular case, endeavoring to determine the intention of the parties from the language used in the instrument as a whole."

Or as stated in Petroleum Co. v. Coal, etc., Co., 89 Tenn. 381, 18 S. W. 65, in ascertaining the intent of the parties to the lease, we will look to all parts of the instrument and to "the facts contained in the transcript." And, as stated in the syllabus in Parish Fork Oil Co. v. Bridgewater Gas Co., 51 W. Va. 583, 42 S. E. 655, 59 L. R. A. 566:

"When its terms will permit it, under the rules of law, an oil lease will be so construed as to promote development and prevent delay and unproductiveness."

For reversal it is urged that the court erred in holding that the lease requires the lessee to drill eight wells within the year as a condition precedent to an extension of its life beyond that term. Not so. True, as urged by counsel for the lessee, if section 3, after granting a fixed term of one year, had said "and so long thereafter as oil or gas * * * is produced from said land," and stopped there, the term would have been extended beyond the year, provided oil was discovered and "produced" upon the land by the lessee within the year. This for the reason that the lessee, by such discovery and production, would have performed the condition precedent to the extension of the term. For, as stated in Thornton on Oil and Gas, sec. 78:

" * * * If such search is unsuccessful, the demise fails therewith, as such discovery is a condition precedent to a continuance or vesting of the demise."

See, also, 27 Cyc. 724; Steelsmith v. Gartlan et al., 45 W. Va. 27, 29 S. E. 978, 44 L. R. A. 107. But the lease did not stop there, but proceeded to specify that oil must not only be "produced" within the year, but must be produced "in accordance with the stipulations of sections 6 and 7 of this contract." Which means that, in order to satisfy the condition precedent to the extension of the term beyond the year, oil must not only be "produced" from the land by the lessee within the year, but must be produced in accordance with and as the result of certain development, the measure of which was prescribed by the parties in those sections and agreed to be performed by the lessee. The lease then proceeds, after providing in section 5 that the lessee shall drill a test well in 30 days from the date of the contract, in sections 6 and 7 to state the measure of that development and from how many wells oil shall be produced to satisfy the condition precedent. Section 6 provides:

"* * * That if said territory proves productive (and it did, for about a 200-barrel well was brought in by the test well), then the party of the second part, to complete this contract, shall drill as many as eight wells on the premises."

Now, as "if" means "when," and "then," when used in this connection, is an adverb of time, meaning "at that time" (Wood v. Schoen, 216 Pa. 425, 66 Atl. 79; Galbraith v Whitaker, 119 Minn. 447, 138 N. W. 772, 43 L. R. A. (N. S.) 427; Utah, etc., Bank v. Jones, 109 App. Div. 526, 96 N. Y. Supp. 338), this means that when the territory by the test well proves productive, then at that time the lessee "to complete this contract"—that is, to perform his part of the contract, or, in other words, to perform the condition precedent to the extension of the term—"shall drill as many as eight wells on said premises." When shall he drill them? At that time, or when the territory proves productive by the test well, then he shall drill eight wells, and certainly not at any time thereafter, or after the expiration of the year, as contended by the lessee. As the evidence discloses that it required only about 20 days to drill a well, this fixed the time for drilling of the eight wells which, as stated, was within one year from the date of the lease. This is in keeping with the spirit of this lease. In short, here is a lease which, in effect, tells the lessee that he, for a valuable consideration in hand paid, may enter and explore for oil for a term of one year from date of the lease; that he shall drill a test well within 30 days from that date, and that, when the territory proves to be productive as a result of that test, he shall then drill eight wells upon the premises as a condition precedent to an extension of the life of the lease beyond the fixed term of one year. When oil is produced by the test well is the time he shall commence the drilling of the eight wells, and he shall drill them on the "premises"—that is, the demised premises—which means that he shall drill them within the term of the demise given him for exploration, which is one year. This lease might be likened to one for a year with the right to hold over, provided the lessee dig a well upon the demised premises. Surely the digging of the well would be a condition precedent to his right to hold over. And when could it be digged in time to secure that right other than within the year? And should the lease provide that the well must not only be digged, but digged in accordance with certain stipulations contained elsewhere in the lease, it is clear that the lessee must not only dig the well within the year, but must wall and curb it, should those stipulations require him so to do, as a condition precedent to his right to hold over. How could it be contended, with any show of reason, that he had a right to refuse to dig the well during the year, hold over, and dig it while holding over? Such is, in effect, the contention of the lessee. In Donnally v. Eastes, 94 Wis. 390, 69 N. W. 157, the court said:

"No particular words are necessary to create a condition. The intention of the parties must be determined from the language used by them, and from the subject-matter to which such language relates. Such intention being determined, it governs."

This is not only an equitable construction of this lease, but is one in favor of develop-

ment and in keeping with the rule laid down in 27 Cyc. 693, which says:

"In construing mining leases, the tendency of the courts is to be guided by an equitable rather than a technical construction of its provisions."

We say this is an equitable construction for the reason that here is a lessee who has entered upon a lease granting him a term of one year in which to explore for oil and gas. If he produces it within that term "in accordance with the stipulations" set forth elsewherein the lease, he has a vested interest in the oil produced, and shall have performed the condition precedent to a continuance of the demise beyond the year. He drills a test well, and thereby oil is produced from the territory. He follows it up with two more until their aggregate production amounts to something like 800 or 1,000 barrels a day. He stops drilling, his year expires, production decreases to about 200 barrels a day, thereby rendering the property comparatively worthless to the lessors, and resists a forfeiture and contends that he is entitled to hold the premises indefinitely without further development. To construe the lease otherwise would not only be to construe it against development, but would be inequitable in that it might enable the lessee to drain the land of oil from adjoining leases and defeat the lessors in the object of the lease, which was their prospective royalties. This view of the requirements of this lease is supported, not only by reason, but by authority.

In Buffalo Oil & Gas Co. v. Jones, 75 Kan. 18, 88 Pac. 537, the consideration of the lease was $1, and the "covenants hereinafter contained" on the part of the lessee. It granted him the exclusive right for two years from the date of the lease, subject to certain conditions therein contained, to explore the demised premises for oil and gas. Section 3 of the lease provided:

"If oil or gas be found on these premises all rights, benefits and obligations secured thereby shall continue so long as either can be procured in paying quantities and party of the second part shall diligently market and utilize the same for the joint benefit of the parties hereto."

Referring to this section, the court in construing the lease said:

"From this it will be seen that two things must concur to extend the life of the lease beyond the period of two years: First, oil or gas must be found in paying quantities; second, the lessee must be diligent in placing the product found upon the market. Gas was found in paying quantities. Whether the lessee used proper diligence or not is a question of fact. This question was decided by the trial court against the plaintiff in error."

And, after reviewing the facts to determine whether the judgment was supported by the evidence, affirmed the judgment, and in passing said:

"It may at least be said that the plaintiff in error has failed to do the acts which in its contract with Jones it expressly agreed to perform for the purpose of continuing the life of the lease. These acts—necessary to the existence of the lease—not having been done, it is at an end."

In the syllabus the court said:

"Where an oil and gas lease covering lands located in a field which is being actively developed is given for a term of two years, and contains a provision that in case oil or gas is found on the premises the lease may be continued in force by the lessee so long as he diligently develops the land and markets the product, the failure of the lessee to use reasonable diligence in the respects named will cause the lease to lapse."

From which we learn, although the lease, as here, did not expressly mention the time in which they should be performed, that the implication and the intent of the lease was to require the lessee to perform, within the two-year term granted by the lease, two things, to wit: (1) That he find gas in paying quantities; and (2) that the lessee be diligent in placing it upon the market as conditions precedent to the extension of the two-year term beyond the two-year term fixed in the lease. All of which is in keeping with the holding of the court in Murdock-West Co. v. Logan et al., 69 Ohio St. 514, 69 N. E. 984, where in the syllabus it is said:

"The stipulation in the lease that the term shall continue 'as much longer thereafter as oil or gas shall be found in paying quantities' requires that oil or gas shall be actually discovered and produced in paying quantities within the term."

And the court, in Cassell v. Crothers, 193 Pa. 359, 44 Atl. 446, was not only of the opinion that the words "as long thereafter as oil or gas is found in the land in paying quantities," contained in the lease there under construction, meant "as long thereafter as oil or gas is actually found in the land in paying quantities," but meant more, and that is, that it must be found in paying quantities "under such developments as the lessee has seen fit to make under covenants in the lease." In the light of which we are of opinion that the lease here, when, after granting, as it does, a fixed term of one year, it adds "and so long as oil or gas * * * is produced on said lease * * * in accordance with the stipulations of sections 6 and 7 of this contract," it means,

when construed in the light of those sections, that oil or gas must not only be produced upon the demised premises within the year, but that such production must be measured by eight wells, drilled within that time as a condition precedent to the extension of the lease beyond the year; and that, as defendants have not performed that condition, but are holding over in defiance of it, the lease should be declared forfeit as prayed.

And the lessee cannot escape a forfeiture by claiming performance of that part of section 6 which, after requiring him to drill "as many as eight wells on said premises," adds: "And said wells shall be drilled with due diligence and dispatch, having in view the interest of the parties hereto, and so as to produce all the oil and gas that may be reasonably produced from said premises." This for the reason that, as we have just held the lease required him to drill them within the year, this was no defense to the suit, and if it were, that whether he met said requirements, being part of section 6 invoked, was a question of fact put in issue by the pleadings and found against him by the general judgment declaring a forfeiture; and the finding is abundantly sustained by the evidence, since it shows that he did not drill them at all, much less "with due diligence and dispatch, having in view the interest of both parties hereto, and so as to produce all the oil that could have been reasonably produced from the premises." And, far from producing all the oil that could have been reasonably produced from the premises, we repeat, he drilled but three wells and permitted production to decrease from perhaps 800 or 1,000 barrels a day to about 200, which might have been in his own interest, but was certainly not to the interest of the lessors; and such is not contended.

We said just now that whether the eight wells called for by the lease were, by the lessee, drilled with due diligence and dispatch, having in view the interest of both parties to the lease, and so as to produce all the oil and gas that may be reasonably produced from the premises, if a defense at all, was a question of fact, made so by the pleadings. And such it was. In Brewster v. Lanyon Zinc Co., 140 Fed. 801, 72 C. C. A. 213, in the syllabus it is said:

"Where the object of the operations contemplated by an oil and gas lease is to obtain a benefit or profit for both lessor and lessee, neither is, in the absence of a stipulation to that effect, the arbiter of the extent to which or the diligence with which the operations shall proceed; but both are bound by the standard of what, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both."

But the lessee relies for reversal on the proviso which immediately follows that part of section 6 just quoted. It reads:

"Provided that if oil be found in paying quantities in the first well drilled, and there is, at the completion of said well, no profitable market for the products of same, the second party shall not be required to begin the drilling of the second well until a market for the products of the first well is available."

And insists that he was excused from drilling any but the test well for the reason, not that oil was not found in paying quantities in the test well, but that at the time of its completion there was no profitable market for its products. This also was an issue of fact pleaded in avoidance of a forfeiture, and as such was joined by reply, in effect a general denial, and tried and found against the defendants. And, contrary to their contention, there was evidence reasonably tending to support it. The record discloses that at the trial the defendants did not assume the burden of proof in support of their plea or offer to prove that there was no profitable market for the product of this well at the time it was completed, but that plaintiffs, assuming the burden of showing that there was, adduced the following, which was all the testimony on the point:

Mr. A. C. Cruce testified:

"Q. I will ask you whether or not, of your own knowledge, you can say whether after well No. 1 was drilled in, the entire production of that well was marketed? A. My understanding was it was; however, I don't know for how long, perhaps for months.

"Mr. Ramsey: The defendant admits that on the 29th of January, 1914, it began to market oil from the first well, but whether they marketed it all I am not advised just now.

"Mr. Stewart: We will assume for a while that all the oil was marketed.

"Q. How much did that oil bring per barrel? A. One dollar and five cents, I think; it is possible that for a few days it sold for a dollar and three cents. My recollection is that it was sold for $1.05 per barrel. * * * Q. Mr. Cruce, I will ask you whether or not the Paraffine Oil Company, or these gentlemen who represented them, ever suggested to you that they could not find a market for the production of the first well? No, sir."

On cross-examination he testified:

"Q. Some oil from these wells has been sold from time to time to the Magnolia Pipe Line Company? A. Yes, sir. Q. One-sixth part,

the royalty you got, that was sold to the Magnolia Pipe Line Company? A. Yes, sir."

Mr W. R. Bleakmore testified as follows:

"Q. At the time or prior to the time the second well was drilled was any complaint made to you that they couldn't market products of the first well? A. No. sir. Q. Did the Paraffine Oil Company or any persons having an interest in there make any complaint or objection to you that they couldn't afford to drill the second well because they couldn't find a market for it? A. No, sir. Q. Did they dig the second well voluntarily? A. Yes, sir."

W. I. Cruce testified as follows:

"Q. After the first well was drilled on these premises and began to produce do you know and can you say whether any complaint was ever made to you by the Paraffine Oil Company or any of the parties to this contract that they couldn't find a market for No. 1 before they drilled No. 2? A. No, sir; the man that reported to me, I was the one they reported to, he came to me frequently and talked about how they were getting the oil off and was pleased with it. Q. Was any complaint made to you that he couldn't find a market for No. 1 before drilling No. 2? A. No, sir."

Mr. Weiss, the president of the Paraffine Company, testified as follows:

"Q. What did you do with the oil you got from that well (meaning first well)? A. Run it into wooden tanks. Q. Did you have any market for it? A. Not immediately upon its completion. Q. How long before you did find one? A. About ten days; January 20th. Q. Who was the purchaser? What market did you find? A. The Magnolia Pipe Line Company constructed two storage tanks in the field. We run it into these tanks with other operators and producers. Q. You ran it into these tanks with other producers? A. Yes, sir. Q. After the Magnolia Pipe Line Company ran the oil, did they pay for it? A. Yes, sir. Q. When did they begin to run oil and pay for it? A. We began to run oil the 29th of January, and run some in February and March, and they paid for that oil that went into the tanks the same as oil they run after the line was completed."

All of which reasonably tends to prove that nine days after the first well was completed, there was not only a profitable market for its oil, but that it was sold upon that market and continued to be sold throughout February and March. And, as the record elsewhere discloses that the second well was completed about the 1st of March, at which time both wells were pumping, and no objection was raised to its drilling by the lessee on the ground that oil had not been found in paying quantities or that there was no market for the product of the first well, that defense no doubt appeared to the trial court to be an afterthought. And this appearance was, perhaps, not overcome in the mind of the court by the testimony of the president of the Paraffine Company who sought to explain that the second well was not drilled in apparent acknowledgment that there was a profitable market for the product of the first well, but was drilled as an offset well, pursuant to section 7 of the lease, and such he might have made appear, had he not further testified that at the time it was drilled, there was no well on the adjacent property to offset. And, so far as the record discloses, there never was, and further, section 7 does not authorize the drilling of an offset well unless there was.

There was no error in the exclusion of testimony, in effect, that there was, long after the completion of the three wells, no profitable market for the product of all three wells. This for the reason that such evidence was outside the issues.

Neither was there error in the exclusion of certain orders made by the Corporation Commission regulating the purchase of oil by the Magnolia Pipe Line Company in the Healdton field, the first of which was issued by the Commission May 7, 1914; all of which were set up by defendants' amended answer, which the court refused leave to file. This for the reason that such refusal, if assigned as error, is not urged as such in the briefs. Besides, we cannot see what bearing the orders would have, if introduced, upon any issue in this case. This being the state of the record, the court did not err in declaring a forfeiture of the lease in virtue of section 11 of the contract, which declares that a failure on the part of the lessee to comply with any of the stipulations in the lease shall of itself work a forfeiture thereof, and all rights thereunder. This for the reason, as we have seen, that the lessee, by failing to drill as many as eight wells within the term of one year, failed to perform the condition precedent to the continued life of his lease beyond the term. By such failure no estate in the demised premises vested in him beyond the term, and equity is helpless to relieve from the consequences of his own neglect.

Wellsville Oil Co. v. Miller, 44 Okla. 493, 145 Pac. 344, was a suit in equity to validate an oil and gas lease made to the oil company as lessee by Martha Miller, and to cancel an outstanding lease on the same property from the same lessor. There was a demurrer sustained to the petition, which disclosed that the lease sought to be validated was executed pursuant to an order of the United States Court for Indian Territory, directing a guardian and his ward to execute the same upon the ward's land, upon condition that the lease be approved by the Secretary of the Interior. The order required the bonus to be given

therefor to be deposited in a certain bank, there to remain until such approval was had, after which the bonus was to be turned over to the guardian and the lease to the lessee. On this state of facts the court, affirming the judgment of the trial court, held that the approval of the lease by the secretary was a condition precedent to the vesting of any estate in the lessee by reason of the lease, and, as the lease was never approved, no estate vested. Quoting approvingly from 4 Kent, 125, the court said:

"These conditions are also either precedent or subsequent; and, as there are no technical words to distinguish them, it follows that whether they be the one or the other is matter of construction, and depends upon the intention of the party creating the estate. A precedent condition is one which must take place before the estate can vest or be enlarged; as if a lease made to B. for a year, commence from the 1st day of May thereafter, upon condition that B. pay a certain sum of money within the time, or if an estate for life be limited to A. upon his marriage with B., here the payment of the money in the one case and the marriage in the other are precedent conditions, and, until the condition be performed, the estate cannot be claimed or vest. Precedent conditions must be literally performed, and even a court of chancery will never vest an estate, when, by reason of a condition precedent, it will not vest in law. It cannot relieve from the consequences of a condition precedent unperformed."

This leaves the lessee and his assigns holding over after the expiration of his term with, as expressly stipulated in section 11 of the lease, "no rights thereunder." And we will not decree them a right of possession to the extent of their three wells and equipment, together with acreage sufficient around each well to operate the same. This for the reason that it would not be equity to, in effect, vest in them an estate in part which they, by reason of their wrongful acts, have failed to vest in whole. Neither are they entitled to a return of the $6,000 bonus paid for the lease. This for the reason that the bonus supported the fixed term of one year in which to explore, and the same has been earned by the expiring of that time. Brown et al. v. Wilson et al., 58 Okla. 392, 160 Pac. 94. But, as the lease provides that they may, at any time, remove all machinery and fixtures placed upon the premises, including casing from all but producing wells, with the right in the lessors to purchase same on 30 days' notice of their desire so to do, after being notified by the lessee of their intention to withdraw the same, let both lessor and lessees proceed to exercise their rights under this section of the lease, and also let no account be taken of the costs of drilling the wells or of the expense of operating the property from

the inception of the lease up to the date of the judgment appealed from; but, as the tenancy of the lessee was good for one year, and his holding over can in no sense be held to be that of a willful trespasser, let compensation to the lessors for the oil produced during that time be measured by the fair market value of the oil in place, or, in other words, the usual royalty for mining, which is indicated in the lease to be one-eighth; and to that end, let an account be stated between the parties up to the time of the judgment appealed from, as manifestly for whatever damage the lessors may have sustained pending appeal the supersedeas bond must respond. This method of accounting is in keeping with the weight of authority. Coal Creek Min. & Mfg. Co. v. Moses, 83 Tenn. (15 Lea) 300, 54 Am. Rep. 415; McIntosh v. Ropp, 233 Pa. 497, 82 Atl. 949; Stark et al. v. Pa. Coal Co., 241 Pa. 597, 88 Atl. 770; Sandy Riv. Cannel Coal Co. v. White House Cannel Coal Co., 125 Ky. 278, 101 S. W. 319, 102 S. W. 320; South Penn Oil Co. v. Haught et al., 71 W. Va. 720, 78 S. E. 759; Backer v. Penn Lubricating Co., 162 Fed. 627, 89 C. C. A. 419; Midland Oil Co. v Turner, 179 Fed. 75, 102 C. C. A. 368; Cascaden v. Dunbar et al., 191 Fed. 471, 112 C C. A. 115; Lyons v. Central Coal & Coke Co., 239 Mo. 626, 144 S. W. 503.

And, although we have held that the lessee, for failure to perform the condition precedent prescribed in the lease, had no vested interest in the oil extracted, its taking pursuant to the terms thereof was in good faith and did not constitute of him a willful trespasser; nor will the rule of accounting mentioned be influenced by the objection that it, in effect, compels the lessors to sell their oil whether they would or not. In Lyons v. Central Coal & Coke Co., supra, the rule was applied and the court said:

"We fully appreciate the force of plaintiffs' argument that sale for a royalty is a matter of contract, and that the rule announced above in effect compels the owner to sell, whether he will or not. This argument would apply with full force to a case where the taking was a willful trespass; but, where the taking is in good faith, the abstract right of contract ought not to prevail over plain justice. Whether the taking was intentionally wrongful is the controlling question upon this point."

We can take no notice of the gross production tax alleged in the briefs of the lessees to have been paid by them, for the reason that there is no evidence concerning it before us, and, besides, we express no opinion as to whether or not the same would constitute a proper charge against the lessors. Let the costs of this cause be paid by the defendant lessees.

All the Justices concur, except KANE, C. J., who dissents.

THACKER, J. (concurring). I concur in the opinion of the court in this case; but I desire to set forth my own views somewhat more fully than they are expressed in that opinion; and in doing so I shall assume that the facts stated and the reasoning in that opinion will be borne in mind by the reader of this, as this is merely supplementary. All the italicization following herein is my own. I think the words "to complete this contract" in section 6 of the same should be construed to mean **to complete the contracting oil company's right, and the right of its successors or assigns, to hold the estate and take oil from the land in** accordance with the stipulation of sections 6 and 7 of this contract *"as long"* (after the fixed term of one year) "as oil or gas, or either of them, is produced from said land," as provided in section 3 of the contract; and, of course, this construction includes the view that the provision of section 6 that "if said territory proves to be productive, then the party of the second part to complete this contract shall drill as many as eight wells on said premises, and said wells shall be drilled with due diligence and dispatch, **having in view the interest of both parties hereto, and so as to produce all the oil and gas that may be reasonably produced from said premises,"** is, in respect to the qualification of the requirement of "due diligence and dispatch" by the provision that the interest of both parties is to be considered in determining what is such "due diligence and dispatch," subject to the limit of one year upon the term for which the contracting oil company, its successors and assigns, may hold the estate without regard to the continuity of the production of oil or gas therefrom by compliance with the terms of the contract in other respects. The first and all subsequent producing wells might have failed during the first year of the estate in question without affecting the oil company's right to hold the estate and continue to the end of the year to drill for oil and gas thereon; but, after that time, it appears that the right to hold the estate depends upon the continuity of the production, and it seems that the only practical purpose of specifying a term of one year was to limit the time for a minimum amount of development work, i. e., the minimum number of wells to be drilled.

Why did this contract not merely specify that when the existence of oil and gas is found in paying quantities on the premises the oil company should, within a reasonable time thereafter, drill as many wells as might be necessary to exhaust, as far as practicable, that supply, "having in view the interest of both parties"; and then, instead of specifying one year, why did this contract not fur-ther provide merely that if the premises proved productive after the first, or any specified number of wells was drilled, "this lease shall remain in force as long as oil or gas, or either of them, is produced from the land by the oil company, its successors, or assigns," etc.?

The answer is that the parties intended to fix a minimum amount of development work and a more definite period within which such minimum amount of development work should be done; and the contract in this case specifies eight wells as the minimum amount of development work and one year as such more definite period for this work.

Section 6 of this contract specifies eight wells to be drilled; and, if the mutual interest of the parties is to determine the number or fix the time for such work after the premises were discovered to be productive by the drilling of the first well at the time required, no good reason appears for specifying either eight wells as the number or a more definite term of the estate than "as long as oil or gas, or either of them, is produced," etc.

It seems reasonably certain that eight wells are not specified as both the maximum and the minimum number to be drilled; but this number is evidently specified as a minimum, not the minimum for the entire term of the lease, as more wells might be required either under an implication of the law that the number of wells should be sufficient to practically exhaust the supply or under the provision for offset wells, but the minimum to be drilled within one year.

I think the opinion of the court is correct.