## CHARLESTON

SOUTH PENN OIL CO. *v.* HAUGHT *et al.*

Submitted June 14, 1911.    Decided February 4, 1913.

OIL AND GAS—*Lessee—Royalty—Accounting.*

    S. grants to S. P. O. Co. "the undivided one-fourth of all the oil and gas in and under" a tract of land, subject to an oil and gas lease then held by the grantee from the grantor on the same land, which provided that in case of production, the lessor was to receive one-eighth as royalty.    The grant also provided that, if the land was operated under the lease, the grantee should receive one-fourth of the royalty provided in the lease to be delivered to the lessor. There were no operations under the lease and it expired. Oil was later produced from the land by a lessee of a subsequent grantee of the land, both of whom had knowledge of S. P. O. Co.'s claim of title to one-fourth of the oil and gas. In a suit by S. P. O. Co. for an accounting and to enjoin further development, *held:*

    I.    The grant vested S. P. O. Co. with title to one-fourth of the oil and gas under the land.

II.  That the production of oil without its consent constituted a waste and gave it the right to an accounting.

III.  That, under the circumstances of the case, the fair and equitable basis for accounting is the one thirty-second (1/32) of the entire output of oil delivered to it in the pipe line.

IV.  That it has a right to have any further development of the oil and gas enjoined.

Appeal from Circuit Court, Monongalia County.

Bill by South Penn Oil Company against A. P. Haught, trustee of Joseph S. Smith. Plaintiff's bill was dismissed, and it appeals.

*Reversed and Remanded.*

*A. B. Fleming, Charles Powell* and *Kemble White,* for appellant.

*Dille & Dille* and *Moreland, Moreland & Guy,* for appellees.

WILLIAMS, JUDGE:

Claiming to be the owner of the one undivided fourth of the oil and gas in place under a certain tract of land containing 62 acres, situated in Battelle district, Monongalia county, owned by the defendant, Joseph S. Smith, plaintiff brought this suit against A. P. Haught, lessee of said Smith, and others, for an accounting for its alleged share of the oil produced from the land, and to enjoin further boring of wells. The court refused relief and dismissed plaintiff's bill, and it has appealed.

It is important first to determine whether plaintiff is a joint tenant with said Smith of the oil, and that question depends upon the effect of the following deed made to plaintiff, by Joseph S. Smith's father and grantor, viz:

"This deed made the 28th day of October, in the year A. D. 1897, between Japheth Smith of Wadestown, Monongalia county, West Virginia, party of the first part, and South Penn Oil Company, a Pennsylvania corporation, party of the second part.

"Witnesseth, that in consideration of One dollar, first party does hereby grant and convey with covenants of general warranty, unto the said party of the second part, its successors and assigns, the undivided one fourth of all the oil and gas in and under the following described lands situate in Battelle district,

71 W. Va.

Monongalia county, and State of West Virginia, namely: lying on the waters of Dunkard creek bounded substantially as follows: (here follows the description).

"Subject however to a certain lease for oil and gas purposes made by Japheth Smith to South Penn Oil Company, dated the _____day of _____, 18____ and recorded in _____ County in _____Book_____ at page_____.

"And so long as said premises are operated under said lease the party of the second part hereto shall be entitled to receive one fourth of the royalty provided therein to be delivered to the party of the first part, together with the right of ingress and egress to, upon and from said lands for oil and gas purposes, subject to the lease aforesaid. And further when the lease above recited shall expire or become void the party of the first part does hereby demise and lease unto the party of the second part, its successors and assigns, the land above described for the purpose of operating for and producing therefrom the remaining undivided one fourth of the oil and gas contained in and under said land (being the undivided one fourth of said oil and gas not hereby sold) for the term of twenty years from the expiration of said lease, and as long thereafter as oil and gas is found in paying quantities and the party of the second part hereby agrees to pay therefor, while the lease of said one-fourth interest shall remain in force and effect, the one thirty-second part of all the oil produced and saved from said land and fifty dollars per year for each and every gas well while the product therefrom is being sold and utilized off the premises.

"This grant shall bind the parties, their heirs, executors, Administrators and assigns.

"Witness the following signatures and seals.

JAPHETH SMITH, (Seal.)

"Attest: A. A. J. GASKILL."

The lease referred to in the foregoing deed was dated the 13th of April, 1896, and was to remain in force for five years, and as long thereafter as the land was operated for the production of oil and gas. No operations were ever had under that lease, and it expired on the 13th of April, 1901.

There is no doubt that the purpose of the grantor in the foregoing deed was to invest the grantee with a present estate in

fee simple, in and to the individed one-fourth of all the oil and
gas under the 100 acres of land, and that the legal effect of the
language used fully accomplishes that purpose. Counsel for de-
fendants insist that the intention was to grant a one-fourth
of the royalty interest only. We do not think so. In order to
arrive at the purpose the whole instrument must be read togeth-
er, and its various parts made to harmonize if possible. That
part leasing a fourth, *not sold*, is not material. It does not con-
flict with the grantor's purpose to convey one-fourth in place, nor
does it shed any additional light upon the granting clause. The
deed is clearly divisible into two separate and distinct parts: (1)
a grant for one-fourth, and (2) the lease of another fourth. And,
inasmuch as the plaintiff claims nothing under the lease, it may
be eliminated altogether.

The first part of the deed is, in form and effect, an absolute
grant of an undivided one-fourth of all the oil and gas in place.
The language could not be plainer to signify an intention to con-
vey such an estate; read alone, it is too plain to admit of con-
struction. No other part of the deed indicates any different
intention, because there is nothing that conflicts with the grant-
ing clause. At the date of the deed, the grantee held an oil
and gas lease on the land, but that did not prevent the lessor
from granting what he had. He simply granted "subject to the
lease." That was not a restriction upon the grant; it was simply
to preserve the rights of the parties to the lease. No develop-
ment had been made at that time, and hence the lessee had ac-
quired no vested interest in the oil and gas in place; it had only
the right of exploration, and, on finding oil or gas, the right to
extract it. The title to those minerals was still in Smith, be-
cause they were then parts of the realty. And the existence of
the lease did not prevent him from parting with his title to
those minerals in place. The following provision harmonizes
well with the purpose to grant title to one fourth of the oil and
gas in place, viz: "And so long as said premises are operated
under said lease the party of the second part hereto shall be enti-
tled to receive one-fourth of the royalty provided therein to be
delivered to the party of the first part.' This shows a purpose,
not only to vest the grantee with title to so much of the oil and
gas in place as the grantee would have acquired a right to un-

der the terms of the lease, if it had developed the property, but also title to so much of the royalty oil as the grantor would have been entitled to receive on account of the undivided one-fourth, to-wit, one thirty-second (1/32) of the oil. So that, whether the lease was worked or not, it was clearly the grantor's purpose to part with all his title and interest so far as it related to the undivided one-fourth. Plaintiff, therefore, became the joint tenant of Japheth Smith in the oil and gas, at the same time that it was his lessee. Of course, the rights acquired in the one-fourth by the lease, were merged in its greater estate. But the lease was still operative as to the remaining three-fourths owned by its grantor. The expiration of the lease did not operate to divest plaintiff of its title to the one-fourth.

The real consideration paid the grantor was not one dollar, as the deed recites, but five hundred dollars, and the receipt signed by him on the day the deed was executed states that it was given for "the undivided one-fourth (¼) of all Oil and Gas in and under my farm of 100 acres situated in Battelle District, Monongalia County, West Va." This is in harmony with his deed.

In 1899 Japheth Smith granted to his two sons, Joseph S. and James F. Smith, the said 100 acres of land, in severalty, granting to the defendant Joseph S. Smith 62 acres thereof, which is the land from which the oil now in controversy is being produced. And on the 24th of April, 1907, J. S. Smith executed to A. P. Haught an oil and gas lease upon it, in consideration of the delivery to him in the pipe line, of one-eighth of the oil produced; and $100 a quarter, payable in advance, for each gas well. Joseph S. Smith and Haught both had knowledge, actual and constructive, of the deed from Japheth Smith to plaintiff, before boring for oil. In December, 1908, Haught began preparations for drilling a well, and in two or three months, completed the first well at a cost of about $10,000. He continued drilling, until he had put down four wells, all of which proved to be flowing wells.

Joseph S. Smith was the joint tenant of plaintiff in the oil and gas, and the sole owner of all other parts of the land. But he had no right to extract the oil without his co-tenant's consent, and could confer no such right upon another. The ex-

traction, by one joint tenant, of oil and gas without the consent of his co-tenant constitutes waste; it is a trespass for which he is liable to account to his co-tenant. *Cecil* v. *Clark,* 49 W. Va. 459; *Stewart* v. *Tenant,* 52 W. Va. 559.

Plaintiff's bill prays for an inunction to prevent further waste, and for an accounting for the value of one-fourth of the oil that has been, and is being produced from the four flowing wells.

The question that has given us most trouble to decide is, what is the proper basis of accounting? Should plaintiff receive one-fourth of the oil in gross, or should it be charged with one-fourth of the cost of production? Neither J. S. Smith nor his lessee Haught were ignorant of the plaintiff's claim of title. At the time he was making preparation to drill the first well, and before he had erected his derrick, to-wit, on the 22nd of December, 1908, Haught was served with the following notice, viz:

PITTSBURG, PENN'A, December 22nd, 1908.

*"South Penn Oil Company:*
MR. A. P. HAUGHT:

"We understand that you are starting a well on what is known as the Joseph Smith farm, Battelle District, Monongalia County, West Virginia. We are the owners in fee of one-quarter of the oil and gas in said property and will look to you to account to us for one-quarter of the entire product of any wells drilled on this property without cost to us.

"Yours very truly,
(Signed)      E. E. CROCKER, Vice President."

Furthermore, in his testimony he admits that he was aware of plaintiff's claim. And again, after the first well was drilled, Mr. Haught had prepared a division order, by which the pipe line company was authorized to deliver to plaintiff one thirty-second of the oil; it refused to sign the order, and again notified Mr. Haught, on the 3rd of April, 1909, that it claimed one-fourth of all the oil produced from said farm, and demanded that that much be delivered to it. On cross-examination Mr. Haught was asked if he had not contracted for about all the materials for wells Nos. 2, 3, and 4, after this last notice was served upon him, and his reply was: "I want to say, I tell you brother, I didn't pay no attention to their notice."

Mr. Haught was not ignorant of his co-tenant's claim. His mistake lay in giving a wrong construction to the deed under which plaintiff claimed title, a mistake of law, against which the law itself gives no relief. But should not the plaintiff who has invoked the aid of a court of equity, be also required to do equity? And would it not be both a severe punishment to Haught and his associates for the trespass, and an enormous profit to plaintiff, to require them to account to it for the one-fourth of all the oil produced? Would not a fair compensation for the wrong be the value in place of plaintiff's one-fourth of the oil; and is that any more than the value of the royalty oil after it is produced? Plaintiff, by its own lease which it had suffered to expire, estimated the oil in the ground as being equivalent to one-eighth of the same oil above ground. It could not be utilized while in the earth; it had to be brought to the surface before it could be marketed. It had only a speculative value in the ground. In view of the facts and circumstances of this case it is just and equitable to require the defendants to account to the plaintiff for the royalty, or the one thirty-second of the oil produced, and to be produced from the four wells, as being a just compensation for the wrong, the waste committed. Plaintiff's equities are no greater because of the notice it served on Haught; it only informed him of the amount of oil it would claim from any producing wells he might drill on the property, and, in contemplation of law, he knew that already. The notice did not warn him to cease drilling; and it is possible, and perhaps highly probable, that plaintiff wished that he might continue to drill, in order to test the property, knowing full well that it could not be held liable, in the absence of an agreement to that effect, for any part of the expense of sinking a dry well. The notice is artfully drawn, and is almost as significant for what it fails to say, as for what it in fact does say. Plaintiff took no active steps to prevent drilling until after Haught had sunk four producing wells at a total cost of about $40,000. It then waited nearly five months after it had been presented with the division order prepared by Haught, conceding to it only a one thirty-second part of the oil produced, before bringing this suit. In view of these facts, we do not think it has any better reason to demand its one-fourth

of the oil, free from cost of production, than did Jones, in the case of *Williamson* v. *Jones,* 43 W. Va. 562. Under the circumstances of that case it was held, (syl. pt. 18), that: "A party taking petroleum oil unlawfully is allowed all costs of production, including costs of boring productive wells, as a set-off against rents and profits." The same principle was again announced and applied in *Stewart* v. *Tennant,* 52 W. Va. 559, and in *Cecil* v. *Clark,* 49 W. Va. 459, which was a suit by one co-tenant against another for the unlawful extraction and sale of coal from under the land. In that case the tenant committing the waste was required to account to his co-tenant only for his share of the profits, which was his share of the royalty on the coal. The principle applied in the two classes of cases is the same, the fact that property, in the last case cited, was coal, and the royalty so many cents per ton, could make no difference in the application of the principle. It was as much waste to extract coal as oil, and if the court has applied the rule for accounting in that case, that plaintiff asks to have applied in this, the trespasser would have been held to account, not simply for a share of the royalty paid by the lessee, but for the full value of the co-tenant's share of the coal, after it had been mined.

It appears, in this case that the gross amount of oil produced amounts to about $16,000, while the cost of producing it amounts to near $40,000. Therefore, to charge plaintiff with one fourth the actual cost of production, would be to bring it in debt, which is inequitable. It would extinguish its interest. It would be, in effect, forcing it to operate its property at a loss. Haught, however, in the division order signed by him, conceded to plaintiff one thirty-second of the oil, and, in view of that concession, and in view of the fact that plaintiff had formerly leased the property from Japheth Smith and had agreed to deliver to him the one-eighth of the oil to be produced, as royalty, we think that one-thirty-second (1/32) delivered in the pipe line to the credit of the plaintiff, is a fair basis of accounting for the value of its one-fourth of the oil in the ground. Says Judge HOLT, in *Williamson* v. *Jones,* 39 W. Va. at page 264: "I should think that a co-owner, who has expended so large a sum, entirely at his own risk, without the knowledge of the other co-owners, in so hazardous an enterprise as developing oil in an unexplored field,

ought not to do more than account to them for their proportion of a customary royalty, proper and fair under all circumstances."

One joint tenant of oil and gas, having no right to extract it from the earth without the consent of his co-tenant, cannot confer such right upon his lessee. Plaintiff had a right, at any time, to enjoin the drilling of additional wells, and its bill prays for such injuncion. It was, therefore, error to dismiss plaintiff's bill, and to deny it a perpetual injunction against Joseph S. Smith and those defendants claiming under him, mediatelv and immediately, from drilling any other oil or gas wells upon said property. The decree of November 1, 1910, is reversed, and the cause remanded for further proceedings to be therein had according to the principles herein announced, and further according to the principles governing courts of equity.

*Reversed and Remanded.*