# CHARLESTON.

PEERLESS CARBON BLACK COMPANY v. E. N. GILLESPIE *et als.*

Submitted November 22, 1920. Decided November 30, 1920.
Final order modified December 17, 1920. Amended
Opinion filed January 18, 1921.

1. CONTRACTS—*Forfeiture or Penalty Provisions Are Strictly Construed Against Party Benefitted.*

    Provisions of a contract, effecting a forfeiture or exacting a penalty, are strictly construed against the party for whose benefit they were incorporated in the instrument. (p 453.)

2. SAME—*Forfeiture Clause May be Construed Either Liberally or Strictly According to Purpose of Construction.*

    A contract containing a forfeiture clause may be subject to two different rules of interpretation, the liberal and the strict,

according to the purpose for which it is construed; the former, upon an inquiry for the true meaning, intention and purposes of the parties thereto, in any transaction or proceeding for mere enforcement thereof, agreeable to such meaning, intention and purpose; and the latter, in a proceeding by action, re-entry or otherwise, for infliction of the forfeiture. (p. 453.)

3. SAME—*Condition is Not Basis of Forfeiture Clause Unless Definite.*

A covenant or condition, to suffice as the basis of a forfeiture clause in a contract, expressed in general terms, must be certain, definite and unequivocal in meaning. (p. 453.)

4. DEEDS—*No Defeasance of Estate for Nonperformance of Condition Occasioned by a Limiting Condition.*

In so far as an express covenant or condition, designed for defeasance of an estate for non-performance thereof, is itself limited by implied conditions, it is insufficient to sustain a forfeiture for non-performance thereof occasioned by or attributable to any of such limiting conditions, by reason of its uncertainty, although sufficient in the case of non-performance occurring independently of their operation. (p. 457.)

5. SAME—*Provisions Necessary to Work a Forfeiture by Reason of Conditional Covenant or a Limited Condition.*

To make a conditional covenant or a limited condition in a conveyance work a forfeiture of the estate granted, under the operation of a forfeiture clause used in connection therewith, by non-performance, for any omission that may have been occasioned by the limitation of the covenant or condition, it is necessary to provide in the covenant or condition or in the forfeiture clause, in some form, that non-performance of the general covenant or condition shall not be excused by such limitation, or to define the extent to which it will or will not so excuse. (p. 457.)

6. SAME—*Condition Subsequent Performed According to One Interpretation Thereof Will Not Work a Forfeiture.*

If a covenant or condition subsequent on which a forfeiture clause is predicated is susceptible of two reasonable interpretations and has been performed agreeably to one of them, no forfeiture is incurred or suffered. (p. 457.)

7. MINES AND MINERALS—*Covenant of Sub-lessee As to Production From Undeveloped Territory Held Not Breached.*

A covenant in a sub-lease of an oil and gas lease, by which the sub-lessee assumed performance of a prior agreement of

the lessee, to sell and deliver to a third person specified quantities of natural gas from designated and undeveloped territory, is not broken within the meaning of a forfeiture and re-entry clause, predicated upon it and expressed in general terms, by mere failure of the sub-lessee to exercise a high degree of diligence in the development of the property, nor by his failure to adopt and adhere to the method of operation most likely to produce the stipulated amounts of gas, he having been reasonably diligent and having operated in a manner consistent with usage and custom and his duty to the lessor and lessee. (p. 457.)

8.  DEEDS—*Implied Condition or Covenant Will Not Sustain a Forfeiture.*

A condition or covenant arising by mere implication will not sustain a forfeiture. It must be express. (p. 464.)

9.  SAME—*Technical Breaches of Covenant Will Not Warrant Forfeiture.*

Unsubstantial and technical breaches of covenants do not inflict forfeitures. (p. 464.)

10.  APPEAL AND ERROR—*No Inquiry as to Validity of Claims for Damages Set Up in Suit to Impose Condition Upon Defendant's Relief From Forfeiture.*

On the reversal of a decree adjudicating rightful possession of property in one who claims it by re-entry for condition broken, on his bill for an injunction to restrain interference with his possession and cancel the instrument under which he re-entered as a cloud upon his title, on the ground of wrongfulness of the re-entry, the appellate court will not enter upon an inquiry as to the validity of claims for damages set up in the suit for ascertainment and imposition as conditions upon the right of the defendant to be relieved from the alleged forfeiture. (p. 464.)

11.  SAME—*Rights of Parties on Reversal of Decree for Re-entry Determined.*

The sub-lessee, however, is entitled to have an accounting for the oil and gas taken from the leased premises by the re-entrant, pending the litigation, as well as restoration to possession of the premises and all personal property of which he has been deprived; but in the absence of fraud or bad faith in the re-entry, he must allow, in the accounting, credit, by way of set-off, for the actual cost of production of the oil and gas taken and also of incidental improvement of the premises and preservation of the lease; for effectuation of

all which the cause, on reversal of the decree, will be remanded. (p. 466.)

Appeal from Circuit Court, Kanawha County.

Suit by the Peerless Carbon Black Company against E. N. Gillespie and others and Oscar Nelson, with cross-bill by defendants, E. N. Gillespie and others, for injunction, etc. Decree adjudicating plaintiff's right to re-enter on certain oil and gas producing property for nonperformance of conditions subsequent, and relieving defendants, E. N. Gillespie and others, from the forfeiture and restoring them to possession upon certain conditions and defendants appeal and plaintiff takes cross-appeal.

*Reversed; decree for defendant; remanded.*

*Reed, Smith, Shaw & Beal, Law & McCue,* and *Blue & McCabe,* for appellant.

*Frank R. Stoner* and *McClintic, Mathews & Campbell,* for appellee and cross-appellant.

*Koontz & Hurlbutt* and *Price, Smith, Spilman & Clay,* for appellee Oscar Nelson.

POFFENBARGER, JUDGE:

Upon pleadings unchallenged here and clearly developing well defined issues, the decree under review adjudicated rightful re-entry, by the plaintiff, the Peerless Carbon Black Company, upon certain oil and gas producing property, for non-performance of conditions subsequent, written into a sub-lease thereof; and, by way of cross-relief, the right of the principal defendants, E. N. Gillespie and Guffey--Gillespie Oil Company, the sub-leasee and his assignee, to be relieved of the forfeiture and restored to the possession and enjoyment of the property, upon certain conditions. Deeming the burdens imposed, as conditions, unnecessary and unjustified by the relation, situation and circumstances diclosed by the record and denying the correctness of the adjudication upon the issue as to rightfulness of the re-entry, the latter have appealed; and denying right in said defendants to be relieved of the alleged forfeiture, the former has also appealed. A third party to the controversy, who is a defendant in the bill, but, by his answer, virtually joined in the prayer thereof,

entered his appearance and took substantially the same attitude toward the decree as the plaintiff.

The property involved consists of several tracts of land, lying on the north side of Elk River below the mouth of Big Sandy Creek, in Kanawha County, and belonging to James F. Brown, some of which are contiguous and others not. The aggregate area is about 1000 acres and the several parcels are remnants of a larger tract out of which sales have been made. By an agreement dated December 15, 1902, James F. Brown and wife leased them, for oil and gas purposes, to John R. Brown, who assigned his lease to the Peerless Carbon Black Company, a corporation, by a deed dated March 18, 1903. By an agreement dated September 7, 1912, between said Brown and wife and the Peerless Carbon Black Company, the contract of December 15, 1902 was modified in a substantial manner and the modification, to be indicated hereinafter, is deemed to have important bearing upon the relation and rights of the parties. On March 29, 1918, the Peerless Carbon Black Company entered into a contract with Thos. A. Whelan and Thorne F. Koblegard, acting for and on behalf of Oscar Nelson, by which it agreed and bound itself to sell to them 2,000,000 cubic feet of gas per day from the gas to be produced from said J. F. Brown property, and to commence delivery thereof not later than September 1, 1918, and to increase the amount to 4,000,000, upon a certain contingency. At the date of execution of this agreement, there was no production of gas at all on the property, but it was known to be in a proved gas producing section. At about the date of acquisition of his contract with the Peerless Carbon Black Company, Nelson began the construction of a carbon black plant and a gasoline plant, near the Brown property, the former of which was partly completed and put in operation in the latter part of September, 1918, and fully completed in April, 1919, and the other one in February, 1919. Both were using gas from the Brown property, in the year 1919, and at the date of the sub-lease involved here, which bears date May 31, 1919. Operations on the Brown property began in August, 1918.

The sub-lease carries only the Brown property and was executed to E. N. Gillespie, who assigned his right thereunder. to the Guffey-Gillespie Oil Company, a corporation. This company took possession of the property on or about June 7, 1919, at which time three wells thereon had been completed by the Peerless Carbon Black Company and two others commenced, and that company was then delivering to Nelson, under its contract with him, about 400,000 cubic feet of gas per day.

In connection with the sub-lease to Gillespie, the Peerless Carbon Black Company sold him its machinery, tools and appliances on the ground and in use at the time, at the price of $50,000.00. In addition to this, he paid a cash rental of $40,000.00 for the first year and obligated himself to pay annually, in advance, a rental of $40,000.00 for five additional years, after which he was to pay only $1.00 per year, and the term of the lease was fixed at 99 years. To secure the payment of the rentals to become due, Gillespie deposited with the Colonial Trust Company of Pittsburgh, Liberty Bonds amounting to $100,000.00, and executed a bond in the penalty of $200,000.00, to further secure such payment, as well as performance of the other covenants and agreements entered into by him in the sub-lease contract, one of which, constituting the groundwork of this controversy, reads as follows:

"The party of the second part covenants and agrees to assume and become liable for and to carry out the obligations of the party of the first part under and with respect to a certain contract between the party of the first part and Thomas A. Whelan and Thorne F. Koblegard, dated March 29, 1918, and relating to the purchase of certain quantities of natural gas."

He also bound himself to perform all of the covenants and agreements imposed upon the lessees in the Brown leases of December 15, 1902 and September 7, 1912, particularly to pay the rentals and keep the leases alive, and also to be bound by and observe all of the conditions, restrictions, reservations and covenants imposed by said lease agreements, as they were

then binding upon and applicable to the lessee, the Peerless Carbon Black Company.

To further secure performance of Gillispie's covenants, agreements and undertakings, the contract contains a clause accelerating payment of rentals and one giving right of re-entry, in case of default, reading as follows:

"In case default should be made at any time in the payment of any instillments of rent which become due thereunder, or in the payment of any rents or royalties which may come due under the aforesaid Agreements with James F. Brown, et ux., dated December 15, 1902, and September 7, 1912, respectively, as and when the same become due and payable, or in the performance of any other of the covenants or agreements herein undertaken by the party of the second part to be performed, and any such default shall continue for the space of twenty (20) days, then the party of the first part may elect to declare the entire balance of the rent for the full term of this lease due and payable forthwith, and upon notice of such declaration mailed to the party of the second part at his last known address, the same shall become due and payable immediately."

"In case any default shall occur as aforesaid, the party of the first part may, with or without process of law, re-enter and take possession of the premises herein leased and demised and exclude the party of the second part entirely therefrom, and all rights and privileges of the party of the second part hereunder shall thereupon, at the option of the party of the first part, cease and terminate."

The re-entry under the last clause here quoted was based upon an alleged default in respect of the obligation imposed upon the Peerless Carbon Black Company in favor of Nelson by its agreement with Whelan and Koblegard, his representatives, agents or assignors, and assumed by Gillespie. All the rentals due Brown and the Peerles Carbon Black Company, at the date thereof, had been paid. The general character of that obligation is revealed by this provision of the contract:

"The party of the first part, for and in consideration of the covenants on the part of the parties of the second part

to be paid, kept and performed, as hereinafter set forth, have sold and does hereby sell unto the parties of the second part, and agrees that the parties of the second part may take two millions (2,000,000) cubic feet of natural gas per day that may be produced by the party of the first part from certain tracts of land now held and operated and to be operated by the said party of the first part, by lease for the development of oil and gas, known as the J. F. Brown property, containing about one thousand (1000) acres, more or less, situated on the north side of Elk River in Kanawha County, West Virginia."

Within the time allowed him by his contract, Nelson gave notice of his election to take an additional 2,000,000 feet of gas per day. If his full expectation had been realized, he would have received 2,000,000 per day from Sept. 1, 1918, until February 19, 1919, and 4,000,000 feet per day thereafter. Hence when the Guffey-Gillespie Oil Company took over the property, June 7, 1919, under the contract made effective as of May 31, 1919, daily deliveries of 4,000,000 feet were contemplated, but actual daily deliveries of only about 400,000 feet were in effect. At the date of the culmination of the dispute they had been increased to an average of about 1,000,000 feet per day.

The re-entry, if any was actually effected, as for conditions broken or non-performed, occurred March 30, 1920. At about 8 o'clock A. M. of that day, Alton Brown, vice-president of the Peerless Carbon Black Company, in company with Oscar Nelson, appeared upon the property, in the absence of the superintendent of the Guffey-Gillespie Oil Company, and notified the employees that the plaintiff had taken charge of the work and attempted to employ them to work for it, and did so employ part of them. On the return of the superintendent, McLaughlin, he asserted, or attempted to assert, his authority. Thereupon the Peerless Carbon Black Company, having had about forty men sworn in as guards, by a justice of the peace, caused the arrest of McLaughlin and certain other agents and employees, McLaughlin retaliated by causing the arrest and removal of certain persons

claiming to act as employees of the plaintiff. The struggle for possession and control continued until April 3, 1920, on which date an injunction was awarded on the plaintiff's bill praying therefor as well as for cancellation of the sub-lease, one effect of which was to recognize the plaintiff as being in the lawful possession of the property. It enjoined and inhibited the principal defendants, their agents, servants and employes from in any manner interfering with the management and control of the premises.

The action, pleadings and evidence of the plaintiff and the argument submitted for it proceed upon the theory of an obligation upon the sub-lessee to furnish Nelson 4,000,000 cubic feet of gas per day, from the Brown property, if it was possible to do so by the exercise of reasonable diligence in development, conservation of the gas and delivery of the entire production. As has been stated, the deliveries did not at any time even approximate the quantities stipulated for. Certain admitted losses of gas in production and operation are characterized as unjustifiable wastes thereof. Some gas was used on the premises in the production of oil from the wells and for certain other purposes, but not in drilling nor in pumping the oil into the pipe line, except on one or two occasions. Casing-head gas from some of the oil wells was sold and delivered to the United Fuel Gas Company. Other complaints are that the sub-lessee did not use gas pipes of sufficient size to market the gas properly; that it shut off the gas from Nelson's plant and that it wholly repudiated its obligation to supply gas to that plant. In pleadings, evidence and argument, it is urged and insisted that, by the exercise of reasonable diligence and proper development, the stipulated quantities of gas could have been produced, and that, aside from the alleged breach of the condition, by reason of failure to produce and furnish it, the use, waste and sales of gas, or any of them, constituted a breach authorizing re-entry.

On the other hand, it is insisted that the Nelson contract contemplated the sale of only such gas as should be produced from the property, in the development thereof for oil as well as for gas, in the usual and customary method, subject to reasonable and necessary waste, use of gas from the wells in opera-

tion and sales of such casing-head gas as could not be turned into Nelson's lines, without detriment to the production of oil from wells in which such gas accumulates. Another position respecting diligence in development·is that the Nelson contract and the sub-lease contract must be considered and interpreted in the light of and in subordination to, the provisions, conditions, restrictions and obligations, express and implied, of the Brown lease and the modification thereof. That lease, of course, required proper development for oil as well as for gas. The agreement of Sept. 7, 1912, extending the term of the original lease from ten years to twenty and prescribing new terms and conditions as to rentals and royalties, made the implied obligation therein to protect from drainage, by means of off-set wells, an express one, and wholly absolved the lessee from duty to drill off-set gas wells, or any off-set wells save and except wells against producing oil wells on adjacent property and such wells as should be necessary to the development of the premises as an oil property, in the event of development of paying oil wells on adjacent property. At the date of execution of the Nelson contract, there was no production of any kind on the Brown property, but, at the date of the execution of the sub-lease, there were producing oil wells on some of the southern portions of the Brown property, as well as on lands adjoining those portions. The Peerless Carbon Black Company was then operating thereon and producing both oil and gas from the same wells and·furnishing the gas to Nelson.

The rule of practical construction is invoked by both sides and there is considerable conflict in the oral evidence, as well as in the inferences arising from the circumstances, as to the interpretations put upon the contract by the interested parties. As the personal property purchased from the lessee, at the price of $50,000.00 was already in use at three wells completed and in operation and two others then drilling and both oil and gas had been found in paying quantities in those wells, the Guffey-Gillespie Oil Company very naturally and sensibly continued the work in the section in which the Peerless Carbon Black Company had successfully commenced it.

No doubt, a circumstance which emphasized the decision to do so had influenced the determination of the Peerless Company, as to the point at which it began the work, namely, the presence of producing oil wells on property adjoining the Brown tracts on which it drilled, imposing an express obligation to drill off-set wells to protect them from drainage.

After having taken over the three completed and two incomplete wells, the sub-lessee continued the work in that locality and under the conditions obtaining while the plaintiff operated the property, and with a higher degree of diligence. From June, 1919, until March 30, 1920, a period of ten months, it completed ten new wells and had two more under way, whereas the plaintiff had completed three and partially drilled two between July, 1918, and June 1, 1919, a period of ten months, after having delayed commencement for four months after the date of the Nelson contract requiring deliveries of 2,000,000 feet daily on and after Sept. 1, 1918. This accelerated development by the sub-lessee more than doubled the gas deliveries to Nelson.

The plaintiff had not been delivering 4,000,000 feet per day, nor more than about one-tenth of that amount, when the lease was turned over by it, nor was it in a position to do so, nor would it have been able to do so within the ensuing ten months, at the rate of development it was maintaining, all of which must have been apparent to all parties interested, including Nelson.

Before the execution of the sub-lease, Nelson made demands upon the Peerless Company for larger production. This seems to have occurred some time in the spring of 1919, just when, he did not remember. But he seems to have been content with the commence ment of two additional wells, he two in course of drilling when the property was taken over, and there is no proof that Gillespie or his company had any knowledge of that occurrence. There is evidence that he aided in the procurement of the sub-lease, under the impression that more rapid development would result, but this falls far short of proof that he had any assurance from anybody that the plan of operation would be materially changed. If

he demanded such a change, his demand had not been complied with.

Though dated May 31, 1919, and possession taken under it, the sub-lease was not finally closed until about six weeks later. Before it was closed, Nelson complained and the plaintiff took up his complaint with the sub-lessee, but no change in the general plan of operation was exacted, before delivery of the contract.

What Nelson may have expected of Gillespie, has little bearing upon the question of construction, for Gillespie made no contract with him. He dealt with the Peerless Carbon Black Company and, no doubt, analyzed Nelson's contract in the light of the Peerless Company's attitude toward it. After the property was taken over, the original plan of development was adhered to and the work intensified as has been stated. Wells went down more rapidly and the gas supply increased. More than $250,000.00 was expended on the property within ten months, in addition to $90,000.00 paid for machinery, tools, supplies etc., and the first year's rental. Under the conditions prvailing at the time, it was difficult to obtain machinery, tools, appliances and men, and all that could be obtained were procured and used.

In this connection, the complaint is that the sub-lessee did not abandon or modify the scheme or plan of development obtaining when the property was taken over, by drilling some wells on the northern portions of the leased premises, which are regarded by some experts as better gas territory than the land on which it was drilling. This opinion was based upon known geological formations and the existence of some large gas wells in the neighborhood of the northern tracts. But duty to off-set the oil wells on lands adjacent to the southern portions was regarded as paramount, in view of the terms of the modified lease. There is some testimony to the effect that refusal to drill primarily for gas was based, in conversation, upon unprofitableness of gas production at the price paid by Nelson, 4 cents per thousand cubic feet. That, however, occurred in the discussions concerning the construction of the Nelson contract and Nelson's demands

for deliveries of 4,000,000 cubic feet per day. Notwithstanding the complaint, the deliveries were increased agreeably to the obligation of the contract as interpreted by the sub-lessee.

Moreover, there is evidence in the record that the sub-lessee contemplated drilling on one of the northern parcels of land. It was the subject of a conference between Nelson and Miller, vice-president and manager of the Guffey-Gillespie Oil Company, only a short time before the re-entry, and, on February 16, 1920, Miller notified Nelson by letter of his purpose and inquired whether the latter had pipe for extension of his line to that section. This suggestion and inquiry are brushed aside in argument, as an attempt at evasion, on the ground that Nelson was under no duty to extend his lines. Whether he was or not depends upon interpretation of his contract, which is not at all clear as to the extent of his obligation respecting the construction of pipe lines. In one place it speaks of a "pipe line" and others, of "pipe lines." He agreed to build "a pipe line" or "pipe lines" to "within a half mile of the wells". The new well suggested was about 9000 feet distant from the end of the line he had constructed.

At the dates of Nelson's procurement of his contract for gas from the Brown lease and the erection of his plants, he knew, as did the Peerless Company, that acquisition of any definite quantity of gas from that property was problematical. There was a fairly good chance and reasonable prospect of obtaining it, and nothing more. At the date of his contract, there had been no development at all on the property, and work was not commenced until within a month of the time fixed for daily deliveries of 2,000,000 cubic feet. Nor is it apparent that he intended to rely solely upon that contract for his supply of gas. He seems not to have received any gas at his plants until November, 1918, and then the bulk of it was delivered by the Peerless Company from the Summit lease. From that date until May 31, 1919, he received more gas from the Summit lease than from the Brown lease. From June 1, 1919 until December 1, 1919 he purchased much more than half of his gas from the South Penn, Peerless and United

Fuel Companies.    From December 1, 1919 until March 30, 1920, he obtained largely more than half of it from the Brown lease.   He could have used more, but it is significant that immediately after the execution of the sub-lease the Peerless deliveries dropped off more than one-half, and in February, 1920, all outside purchases had dropped to about one-half of the quantity furnished by the Guffey-Gillespie Company.

Upon both evidence found in the record and common knowledge, it may be safely asserted that the oil and gas business is extremely hazardous and largely speculative.   Ignorance of this fact on the part of the practical and experienced men who made these contracts cannot be assumed.   They were equally familiar with the methods and customs prevailing in that business.   The instability and uncertainty of results are illustrated by the disclosed variations in the amounts of gas Nelson was able to obtain from companies other than the Guffey-Gillespie Oil Company, and the extent to which expectations under the Nelson contract had failed before the sub-lease was executed.

As to the right of the Guffey-Gillespie Oil Company to use a relatively small quantity of its own gas upon its own premises, in the prosecution of its own mining operations, there is ample room for an honest difference of opinion.   May not one who has contracted to sell a certain quantity of timber from a certain tract of land, if obtainable therefrom, use enough of the timber from that land to shed his mills, construct roads, build houses for his workmen and the like, without violation of the contract as determined by the true intent, meaning and purposes of the parties?   It would border upon ridiculousness and absurdity to require him to go into the market and buy lumber for such purposes, and a construction of a contract resulting in such consequences is generally regarded as proof of its unsoundness.   In the absence of terms rendering them unavoidable, they are never deemed to have been within the intention of the parties. *Carper* v. *United Fuel Gas Co.*, 78 W. Va. 433, 442.

The alleged waste is explained and harmonized with recognized methods of mining in territory producing both oil and

gas from the same wells. As to what method prevails in such cases, there is some conflict in the evidence, but the one adopted is extensively used and is based upon reasonable and substantial grounds, and was in use when the property was taken over. As far as possible, both the oil and gas must be conserved, and it is admittedly impossible to save all of both or of either. The waste of gas alleged to have been unnecessary, occurred principally at wells Nos. 3 and 15. The former had been drilled by the Peerless Carbon Black Company and was standing open and the gas wasting into the air, when the property was taken over. In it, difficulties had been encountered. It produced oil as well as gas, and, while it might have been immediately shut in and connected up as a gas well, approved mining required its completion and equipment as an oil producer as well as a gas producer, in the opinion of the Peerless Carbon Black Company as well as that of the Guffey-Gillespie Oil Company. The former, in its drilling had left no shoulder for the five inch casing, wherefore the oil and gas could not be separated, until the well was completed for oil, and its completion for oil was attended by accidents and difficulties. Work on it was continuous from October 26, 1919, until the date of the re-entry, except through the period from January 8 to March 4, 1920, in which an emergency in another part of the field required cessation. At the date of re-entry, it had ceased to produce oil and preparation had been made to shut it in and connect it up as a gas well, and the plaintiff, after re-entry, did so connect it.

The explanation of the loss of considerable quantities of gas at well No. 15 is that the well was drilled for gas through two sands, with the expectation of finding it in both, and down into another for oil, in consequence of which gas wasted for a longer period than was usual. At the date of the re-entry, the casing had been put in and the materials for connecting it with Nelson's line were on the ground.

After the wells were cased for gas, Bradenheads put on and pipes inserted therein to take the gas from the wells, pending completion for oil, such as shooting, cleaning out and testing,

the gas was allowed to escape into the air at a safe distance from the wells, the pipes not having been connected with the lines supplying Nelson. According to the evidence submitted by the plaintiff and Nelson, this practice was unnecessary and wasteful. On the other hand, there is evidence, perhaps a preponderance thereof, that it is necessary, on account of danger to the workmen and property, from carrying on the work over the pressure that connection would have imposed upon the Bradenhead.

The drilling was done with gas purchased from the United Fuel Gas Company, and there was some delay in connection, after completion of the wells, due to the use of the lines supplying the drilling gas for connection with the Nelson lines, instead of supplying independent pipes for that purpose. The period of delay in connection after completion ran from one to 24 days, making an average of five and one-half. There is no satisfactory explanation of these delays, it is true, but there is no proof that they were due entirely to the method used, nor that they were longer than was reasonably necessary, under all the circumstances. As to this, the burden of proof manifestly rested upon the plaintiff.

Plausible and possibly tenable excuses of the sales of casinghead gas to the United Fuel Gas Company are discoverable and some, if not all, of them set up. This is gas that comes up with the oil, or through the tube in which the oil is brought up. It is clearly distinguishable in production from ordinary fuel gas, but, nevertheless, it is natural gas. It may be doubted, therefore, with good reason, whether a well producing only casing-head gas is a "producing gas well" to which Nelson's lines are entitled to be connected, within the meaning of the third covenant of the Nelson contract. On a somewhat different, but closely related theory, it is denied that he is entitled to any casing-head gas under any circumstances, altthough he was receiving, at the date of the sub-lease, and continued thereafter to receive, such gas from two of the wells. Secondly, it seems to be impossible to give him the gas from off-set oil wells, without serious detriment to the oil production, in the absence of the use of a

vacuum plant by means of which it can be taken, which Nelson did not have and the Guffey-Gillespie Oil Company was not bound to furnish.   His contract provides for delivery, in the natural state of the gas, into his lines against their pressure.   This would produce gas pressure in the wells, obstructing or diminishing the flow of oil and tending to facilitate drainage through neighboring wells.   Encouragement of such drainage was forbidden by the lease.   Production for prevention thereof was affirmatively and expressly required. The United Fuel Gas Company, by means of its vacuum plant, took this gas without detriment to oil production.

The decree complained of sustained the re-entry upon the theory of default by reason of failure to develope the property with due diligence, use and waste of gas, sales of casinghead gas and repudiation of the contract.   Consideration of the last mentioned ground will be taken up after disposition of the  others.

A re-entry always proceeds upon a forfeiture of an estate, which the law looks upon with disfavor, on account of its harshness and disastrous consequences.   It is never sustained in the absence of a clear right to it.   For the same reason, the right to it is always held to have been waived by any conduct, however slight or simple, from which intention to do so can be inferred.   It may be effectually waived by mere conduct and in the absence of anything that could be regarded as consideration for the relinquishment of a substantial right.    Taylor, Land. & Ten., secs. 497 to 501; McAdam, Land. & Ten., secs. 192 to 193; Tiffany, Land & Ten., p. 1386; 16 R. C. L. 1130.

Being so easily lost, when once acquired, on account of its drastic nature, it is never reckoned nor deemed to be possessed, unless it is shown, beyond question, to have vested in him who asserts or claims it.   All provisions in contracts as well as in statutes and other instruments, purporting to inflict forfeitures and penalties are strictly construed and limited in their operation, to what clearly falls within their terms.   If the breach of the covenant or condition relied upon, as the basis of a forfeiture claimed, is enshrouded in

doubt and uncertainty, by reason of indefiniteness of the terms of the covenant or condition, there is no such breach as will effect a forfeiture, even though it may be sufficient to give a cause of action for damages. This is the clear and manifest result of the application of two distinct principles of interpretation, determinable by the character of the provision to be interpreted, the point of view from which it is examined and the right invoked under it. The same provision in a contract may have a remedial aspect and a penal aspect, just as one may have in a statute. When the former is involved, the rule of liberal construction applies, and, under it, a right of action may be found. When the latter is involved, the rule of strict construction applies, and, under its application, there may be no penalty or forfeiture, notwithstanding the existence of a breach of the covenant or condition invoked, giving a right of action, under the operation of the other rule of interpretation. Forfeiture is not essential to the existence of the obligation to which it relates. They are clearly separable. Hence, the latter may be found in the contract without the former. The distinction lies in the fact that, under the liberal rule, what is within the spirit of the instrument, though not within the letter, is a part of it. Under the other, a thing may be within its spirit and the general intention as indicated thereby, but it is no part of it, unless within the letter also. It is easy, therefore, to perceive that a provision of a contract may carry an obligation without a forfeiture or penalty for enforcement thereof. The obligation involved here is to produce and furnish gas, in certain quantities, from designated territory and under a certain lease thereof, as required by the Nelson contract, the burden of which the sub-lessee assumed. It is binding without a forfeiture clause. Relief may be had for any breach thereof by action, and it will be construed, in such case, under the liberal rule, to effect the the true intent of the parties. But a forfeiture clause has been annexed to it, providing a non-judicial remedy for breach thereof. Procedure under it invokes a penalty, wherefore, in such case, the same covenants and conditions must be interpreted with

reference to the forfeiture clause and the penal desideratum sought by the proceeding.

It is often said rules of interpretation applicable to statutes may be resorted to in the interpretation of contracts and many of them do have common application. No reason is preceived why the principles just referred to, governing in the construction of statutes, do not apply with equal force to contracts. A penalty inflicted by contract is just as harsh and severe as one imposed by a statute. The rules may not be emphasized as much in dealing with contracts, as they are in the analysis of statutes, but they are recognized informally. Ordinarily, a contract is governed by the liberal rule. When, however, a condition precedent or a condition subsequent, in conveyances, is involved, the law discloses its hostility by subjecting it to the rule of strict interpretation, the former being strictly construed in favor of the vesting of the estate and the latter strictly construed against the divesting thereof. Tiffany, Real Prop. sec. 69, citing many authorities sustaining the text; 4 Kent's Com. 129; *Finley* v. *King's Lessee,* 3 Pet. 346. "The deed will not be held to create an estate upon condition, unless the language to that effect is so clear as to leave no room for any other construction." Jones Real Prop. sec. 632. Forfeiture clauses in leases are strictly construed. 24 Cyc. 1347. "Covenants of this description are construed by courts of law with the utmost jealousy to prevent the restraint from going beyond the express stipulation." Taylor, Lan. & Ten., sec. 403; *Doe* v. *Carter,* 8 T. R. 61; *Phila. & E. R. Co.* v. *Catawissa R. Co.,* 53 Pa. St. 20; *Hasbrook* v. *Paddock,* 1 Barb (N. Y.) 635. "The plaintiff's right (of forfeiture) is *stricti juris,* and to enable him to recover on the ground of forfeiture he must bring his case within the penalty on the most literal and rigid interpretation of the covenant." *Jackson* v. *Silvernail,* 15 Johns. (N. Y.) 278. "It has always been considered that it was necessary to restrain it (power of re-entry) to the most technical limits of the terms and conditions upon which the right is to be exercised." Mr. Justice Miller in *Elevator Case,* 17 Fed. 201.

A high degree of certainty and definiteness is an obvious requirement of the rule of strict construction. That rule as well

as reason, conscience, legal policy and fundamental principles demand it in the condition or covenant constituting the basis of a forfeiture clause. Such a forfeiture bears a close analogy to seizure under summary process. In the law of attachment, injunctions, receivership and other similar proceedings, indefiniteness, uncertainty and ambiguity in the foundation of the proceeding are not tolerated. In all of them, there is a summary divestiture of *prima facie* right in the nature of a forfeiture, wherefore what is demanded must be "nominated in the bond." In such cases, the disturbance of the *prima facie* right is not final. It is a mere procedural step. In forfeiture of estate for breach of a condition subsequent, the result is ordinarily final and conclusive. Hence, the requisite of certainty in the condition ought to be the more rigidly and uniformly exacted, and it is.

That the covenant of the sublease, viewed and interpreted in the light of the obligation imposed by the Nelson contract, does not specifically require any of the omitted things nor forbid any of the affirmative acts, relied upon as breaches, is perfectly obvious. Neither of the instruments contains a word expressly indicating the degree of diligence to be employed in development or definition of the mode of operation. Each was executed at a time at which the possibility of realization of Nelson's ultimate expectation was beyond the reach of human knowledge. In the case of the first, there was no more than bare probability of it; and, in that of the latter, only an encouraging commencement of a large and hazardous enterprise. That Nelson's right to have the stipulated quantities of gas was not absolute is admitted. It was dependent at least upon the ability to obtain them from the territory named in the contract, and upon potential progress of the development thereof. It stipulated for a highly improbable result, daily deliveries of 2,000,000 feet of gas on and after September 1, 1918, and 4,000,000 feet per day after six months, if he required. This stipulation was made with knowledge of the conditions and restrictions subject to which development under leases is ordinarily effected, the varying conditions under which gas is found and produced, the physical, industrial and com-

mercial difficulties attending such development and the recognized methods thereof. Notwithstanding all of these necessarily involved elements affecting the progress of the enterprise. upon which realization of Nelson's expectation depended, not a word was inserted by way of provision against the delays or interferences they might cause. Nor was his contract in any way defined or interpreted, in respect of the method of development or the degree of diligence with which it was to be prosecuted, in the covenant by which Gillespie assumed it. If there had been no performance of it at all, or only a mere pretence of performance, the situation would be obviously different. That case we do not have. Partial performance is admitted. Full performance according to the plaintiff's construction has not been rendered. On the other hand, there has been full and complete performance of the covenant as construed by the sub-lessee, in the light of the situation of the subject matter and parties, the conditions surrounding them and recognized methods of mining. The controversy goes only to the degree of diligence required and the method of development, neither of which is defined by any express language of the two instruments involved, nor by practical or contemporaneous construction of the parties, as has been indicated, if that would suffice. And just here it may be observed, that there is no evidence at all of practical construction with reference to the forfeiture clause. It was never under discussion by the parties for a moment after the execution of the paper, so far as the record discloses, until the re-entry was mode or attempted.

Though the relation of landlord and tenant exists here and the law governing it is applicable, the tenancy is not the ordinary one in which the tenant is required to pay taxes and rent, make repairs and use the property in a prescribed manner. It contains important elements not found in ordinary tenancies and leases. One of its obligations resting upon the tenant and affecting the right of Nelson is development of the property, the prosecution of an enterprise thereon, involving recognized, but varying, methods of work and degrees of diligence therein, all affected more or less by surrounding conditions and the nature of the enterprise itself. These elements are most vital

and controlling in their natures and effects. They enter into the forfeiture, if there is one. Here alleged default in respect thereof is the very basis of the claim of forfeiture, and they are in no way dealt with nor even mentioned in the covenant. What the purposes and intention of the parties respecting them were, becomes subjects of surmise, conjecture and results of a wholly inapplicable rule of interpretation

A covenant to pay a stipulated amount of rent, at a designated day, or to pay taxes in an amount to be fixed by public authority, at a time fixed by law, or to repair fences or buildings, or to abstain from use of the property for named purposes, is simple and certain. A covenant to produce and furnish a certain amount of gas, upon implied conditions not specified, and under circumstances rendering it problematical whether the amount can be produced and furnished at all, deals with a different kind of a subject, and, if it is to be brought under the law of forfeiture, the covenant must define and render certain and definite the controlling elements involved. The covenant, or element of the covenant, alleged to have been broken here, is the alleged implied covenant to produce, limited by the nature of the thing to be produced and other restrictions, and the extent of the duty to produce and the character of the efforts to be made to obtain production are wholly undefined.

Whether there has been substantial compliance with the requirements of the covenant, under its interpretation for merely remedial purposes, or not, there has been a sufficient compliance therewith, as to development, to preclude right of forfeiture and re-entry, in view of the uncertainty and indefiniteness of the covenant. Ten wells were drilled within the time in which the Peerless Carbon Black Company, presumptively exercising a reasonable degree of diligence, drilled three. In that period more than $250,000.00 was spent on the property, nearly $35,000.00 of which was used in the installation of special equipment for saving gas for the purposes of Nelson's contract. The production and delivery of gas to Nelson was much more than doubled and was being increased. This activity was confined to the oil producing section, but intention to

develop the supposed gas producing section had been indicated, and might have occurred, but for Nelson's failure to respond to a possibly well founded suggestion of duty on his part respecting the pipe line.

The principle here announced and applied in respect of the implied covenant to produce and some of the foregoing observations cover and fully dispose of the other alleged breaches above referred to. The use of gas in development; excessive waste of gas, if any; and sale of casing-head gas, are not, nor are any of them forbidden by any of the terms of the covenant. As to these matters, the rights respecting which are dependent upon interpretation of a loosely drawn covenant, the contract is susceptible of two plausible and not unreasonable constructions, in each instance, and neither of them has been written into the covenant for the purposes of the forfeiture clause. Moreover, the acts complained of in this connection and relied upon as breaches are relatively insignificant and technical in character. Breaches of that kind do not inflict forfeiture nor afford any ground for re-entry, unless they are forbidden and expressly and specifically made grounds of forfeiture. *Randall* v. *Scott,* 110 Calif. 590; *Hasbrook* v. *Paddock,* 1 Barb. (N. Y.) 635; *Loudin* v. *Schoeffel,* 167 Mass. 465; *Rose* v. *Hawley,* 141 N. Y. 379; *Plum* v. *Tubbs,* 41 N. Y. 442.

There was controversy between the Guffey-Gillespie Oil Company and Nelson about the size of the former's connecting lines in consequence of which some of them were increased from two to four inches. There could be no forfeiture on a mere difference in judgment as to the sufficiency of the pipe lines to carry all of the gas produced for reasons already stated.

It is hardly necessary to observe that an occasional shutting off of Nelson's gas, if it occurred, would not forfeit the lease. It may have been accidental or merely incidental to necessary work. In any event, it was too slight and unsubstantial to effect a forfeiture.

Our conclusions respecting certainty in a covenant or condition, as a *sine qua non* to forfeiture, harmonizes with the holding that a forfeiture cannot be predicated upon violation of a condition or covenant arising merely by implication,

under a forfeiture clause in which it is not specifically mentioned and breach thereof made a cause of forfeiture. *McGraw Oil C.* v. *Kennedy,* 65 Wa. Va. 595, 600; *Core* v. *Petroleum Co.,* 52 W. Va. 276; *Harness* v. *Eastern Oil Co.,* 49 W. Va. 232, 249; *Ammons* v. *South Penn Oil Co.,* 47 W. Va. 610, 629; *Harris* v. *Oil Co.,* 57 O. St. 118; *McKnight* v. *Kreutz,* 51 Pa. St. 232; *Paschall* v. *Passmore,* 15 Pa. St. 295; *Colgan* v. *Forest Oil Co.,* 194 Pa. St. 234; *Hough* v. *Brown,* 104 Wis. 109; *Somers* v. *Loose,* 127 Wis. 77.

What has been said here respecting the construction of the contract must be taken and understood, in every instance as being limited to its interpretation for the purposes of forfeiture. It is not our purpose to indicate what its construction should be, in any respect, in an action for damages, a suit for injunctive relief, or the like.

There was no repudiation of the contract. The Guffey-Gillespie Oil Company remained in possession of the property and carried on its operations thereon, until ousted. It never disavowed its landlord's title. What may have been said in an interview at Pittsburgh, about its intentions, must be considered in the light of its conduct. It went on after that interview and performed its obligations to both the plaintiff and Nelson, as it had been performing them. In the interview, it was resisting demands for immediate adoption of plans, methods and operation that would result in speedy delivery of 4,000,000 feet of gas per day to Nelson. If there was even doubt about its intention to hold on to the premises and continue deliveries to Nelson, its attitude was equivocal and uncertain. There was no absolute and unconditional renunciation of any part of the contract. To result in forfeiture of right, a renunciation must be absolute and unconditional. *Swiger* v. *Hayman,* 56 W. Va. 123; *Ross* v. *Armstrong,* 61 W. Va. 38, *Bannister* v. *Victoria C. & C. Co.* 63 W. Va. 502; *Conklyn* v. *Shenandoah Milling Co.,* 68 W. Va. 567. There is no repudiation, when the party, standing on one reasonable construction, is willing to perform according to it, but declines performance agreeable to another such construction.

It results from these principles and conclusions, that the

re-entry upon the property made by the plaintiff was unauthorized and without right. The sole purpose of its bill in this cause was maintenance of the possession it had so wrongfully taken, and clearance of its title from an alleged cloud. The answer filed by Gillespie and the Guffey-Gillespie Oil Company resisted the claims of forfeiture and rightful possession in the plaintiff, so set up, and sought alternative relief, relief from the forfeiture if any. Construction of the contract, from the remedial point of view, may have been necessary to determination of the conditions upon which such alternative relief could be granted. But, the defensive part of the answer having been sound and sustained in law, the court below should have dissolved the injunction, restored the sub-lessees to their possession, effected restitution in all respects and enjoined the plaintiff from further interference with their possession, agreeably to the prayer of the answer. That would have properly terminated this litigation, without reaching the question of construction for remedial purposes. That will be its termination, unless the cross-pleadings filed by the parties render it necessary to go further.

All cross-relief asked in these pleadings is dependent upon the adjudication of a forfeiture in favor of the plaintiff, which should not have occurred in the court below and will be annulled here. Nelson was a merely formal defendant against whom no relief whatever was sought by the bill. In reality, he was a co-plaintiff and virtually made himself such by his answer in which he asked no cross-relief. In his special replication to the cross-bill of the other defendants, he conditionally and alternatively asserted his claims for damages. His prayer was that, in the event of the award of relief from the forfeiture, his damages be ascertained and payment thereof required, as a condition to the award of such relief. Now that the forfeiture fails and there is no occasion for relief against it, the basis on which he sought ascertainment of his damages likewise fails. If his claims had been asserted in a different way and as independent or supplemental causes of action, the other defendants might have interposed a demurrer chal-

lenging his right to assert them in this suit, on the ground
that they are foreign to the subject matter of the bill. It
suffices, however, to say they were not so asserted and do not
call for any further consideration of the decree under review.

The plaintiff must account to the Guffey-Gillespie Oil Company for the oil and gas taken from the lease, within the period
of the wrongful occupancy and operation thereof, and restore
the premises and all personal property of the latter that went
into the hands of the former and has been retained by it, however, by way of restoration of the *status quo.* The Guffey-Gillespie Oil Company has clear right to an accounting for what
may be legally defined as rents and profits; and it is proper
here and now to determine the basis on which the accounting
shall be made. In character, this accounting is similar to
those involved in *Williamson* v. *Jones,* 43 W. Va. 562; *McNeeley* v. *South Penn Oil Co.,* 58 W. Va. 438, and *South Penn
Oil Co.* v. *Haught,* 71 W. Va. 720. The lease was producing
territory and very considerable quantities of both oil and gas
have been obtained from it and disposed of by the plaintiff and
it is still producing them. The relation of privity subsists
between them. They are not strangers in estate. Both have
rights and interests in the subject matter of the controversy and
the litigation, determination of which turns on close and
intricate legal issues about which both laymen and lawyers
could honestly differ in opinion. If the conduct of the plaintiff
in the exercise of its alleged right of re-entry can be deemed
to have constituted ground of suspicion of the existence of an
ulterior motive, it does not prove such motive. Almost every
doubtful act is susceptible of two or more interpretations,
wherefore the court could not safely proceed upon a mere suspicion of wrongful intention, if proved. In our opinion, there
is no proof of fraud or bad faith on the part of the plaintiff,
and the accounting must be had upon the principle and basis
enunciated in the decisions above referred to. The plaintiff is
entitled to set-off against its liability for oil and gas taken, the
actual reasonable cost of production thereof and of incidental
improvements of the property and preservation and conservation of the lease. The case essentially differs in principle from

that of *Deepwater R. Co.* v. *Chesapeake and Ohio Ry. Co.*, 57 W. Va. 641, in which rents and profits were not involved. The rule here applied is a purely equitable one. The parties to that suit were not in a court of equity. Besides, a right of set-off against a money demand for rents and profits is vitally different from a right to charge land with the costs of improvement thereof made by one in the wrongful occupation thereof. An owner of land cannot be improved out of the value of his property, without his consent. Again the parties to that suit were strangers between whom there could be no equities.

Speaking for myself only, I make the further suggestion, that the injunction under the protection of which the plaintiff carried on its operations, after the re-entry, completely eliminates and precludes all charges of fraud and bad faith from and after the award thereof and calls for a settlement upon an equitable basis. The injunction was regularly obtained and the court awarding it had undoubted jurisdiction to award it, even though the award thereof was erroneous. That a party may justify under lawful process, set aside for error only, is uniformly held in all jurisdictions. *Day* v. *Bache*, 87 N. Y. 56; *Cay Bridge Co.* v. *Magee*, 2 Paige, (N. Y.) 116, 122; *Sturgiss* v. *Knapp*, 33 Vt. 486; *Von Latham* v. *Libby*, 38 Barb. (N. Y.) 339; *Daniels* v. *Fielding*, 16 M. & W. 200. In such cases, the injured party is entitled, of course, to have restored to him what he has been erroneously deprived of, but the other party cannot be penalized in any manner nor to any extent, except in so far as some statute makes him liable. Under our statute, in the case of a preliminary injunction, the plaintiff is required to execute a bond for costs and damages, but there seems to be no liability for damages outside of or beyond that, in the case of an injunction regularly obtained from a court having jurisdiction. Spelling Inj. & Ex. R., sec. 964; *Hayden* v. *Keith*, 32 Minn. 277; *Campbell* v. *Carroll*, 35 Mo. App. 640; *Galveston H. & S. A. Ry Co.* v. *Ware*, 74 Tex. 47.

The decree will be reversed; the injunction awarded the plaintiff dissolved; the right of the Guffey-Gillespie Oil Company to possession and control of the premises in question decreed; an injunction awarded agreeably to the prayer of its

cross-bill, inhibiting and restraining the plaintiff, its officers, attorneys, agents, employees and servants from interfering with such possession; and the cause remanded, with directions to require, by proper orders, decrees and process, rull restoration of such property of the Guffey-Gillespie Oil Company as may be now in the possession of the plaintiff, and for further proceedings. Costs in this court will be decreed to appellants, E. N. Gillespie and the Guffey-Gillespie Oil Company.

### ON PETITION FOR REHEARING.

The double rule of construction criticized in the petition for rehearing applies, of course, only to the contract regarded as an entirety. In liberal construction as defined in the opinion, the forfeiture clause would be practically, if not wholly, immaterial and would not be considered. The contract without that clause is one thing and the contract with it is another, legally speaking. That clause is not essential to right of recovery of damages, injunctive relief, specific performance or any other judicial remedy, not involving forfeiture. But, when a claim of right is based upon the forfeiture clause and other provisions, it is essential, and the construction then involves consideration of the entire contract.

Of course, the argument or reasoning might take a different form. It may be said the interpretation of the covenant or condition is always the same, but that the ambiguous and the implied provisions or elements thereof are not within the forfeiture clause, and are not available for relief by re-entry, while they may be relied upon for ordinary judicial relief. Which method of solution is the better or more consistent is an academic question upon which it is unnecessary to bestow time and labor. Each brings about the same result.

The conclusion that breach of an implied covenant or condition constitutes no ground of forfeiture does not conflict with any actual decision of this court. It is at variance with an *obiter dictum* found in *Carper* v. *United Fuel Gas Co.* 78 W. Va. 433; but that case involved no claim or question of forfeiture. It was a mere action for damages for failure to drill wells. The observation was made only argumentatively, in the course of interpretation of the lease involved, and was not essential to the

conclusion arrived at and announced. It would have sufficed to say a demand for the drilling of off-set wells was a prerequisite to a right of action for damages, instead of a condition precedent to right of forfeiture. On the other hand, the observation may be correct and yet not inconsistent with the position taken here in conformity with previous actual decisions. Denomination thereof as a mere *dictum* is all the present situation requires.

<em>Reversed; decree for defendant; remanded.</em>